# Court of Appeals.

January 17, 1893.

## PEOPLE v. CARLYLE W. HARRIS.

(49 St. Rep. 751; 136 N. Y. 423.)

**1. Homicide—Question for jury.**

Where, upon the trial of defendant for murder, the symptoms and subsequent revelations by autopsy and analysis were those which invariably accompany and characterize poisoning by opium and morphine, the question of what was the cause of death is one, the determination of which, upon sufficient evidence, belongs to the province of the jury, and the appellate court has no right and there is no reason to interfere with this branch of the case.

**2. Same—Circumstantial evidence.**

In case of circumstantial evidence, there must be positive proof of the facts from which the inference of guilt is to be drawn, and such inference must be the only one which can reasonably be drawn therefrom.

**3. Same.**

Where circumstantial evidence points irresistibly and exclusively to the commission of the crime by the defendant, a verdict of guilty may rest upon a surer basis than when rendered upon the testimony of eye witnesses. If, taken together, it leads to a conclusion of guilt with which no material fact is at variance, it constitutes the higher form of evidence which the law demands where the life or liberty of the defendant is at stake, and neither jurors nor the court can conscientiously disregard it.

**4. Criminal action—Another offense.**

The rule that evidence in criminal cases should be confined strictly to the question in issue is not infringed upon because the evidence offered, while tending to prove some essential fact in the guilt of of the accused, may also prove the commission of another offense.

**5. Same.**

Evidence of another offense is admissible whenever it sustains the charge by showing scienter or motive.

**6. Witness—Privileged communication—Physician.**

Where a physician, with whom the deceased remained for two months and who operated upon her and removed a dead child of

five months, is allowed to testify to a conversation with the defendant, which tends to prove him guilty of another crime, such conversation is not privileged and, inasmuch as the witness was not employed by the defendant, did not acquire any important information from him which he was not already possessed of, or which was necessary to enable him to act in a professional capacity.

### 7. Same.

Privilege from disclosure by a physician cannot be invoked by a person on trial for murder of the patient.

### 8. Evidence—Hypothetical questions.

Hypothetical questions are properly excluded, where there is no foundation in the evidence for the facts assumed.

### 9. Same—Previous bad character.

While evidence merely to show previous bad and vicious character is inadmissible against one on trial for the commission of a criminal offense, they become admissible, if the depraved acts offered to be shown, evidence or throw light upon the motive.

### 10. Trial—Charge.

A refusal to charge a particular request, in a criminal case, which has been covered in the main charge, is discretionary.

Appeal from judgment of court of general sessions of the peace of the city and county of New York, convicting defendant of murder in the first degree, and from order denying motion for new trial.

William F. Howe, for appellant.

De Lancey Nicoll, dist.-att'y, and Henry B. B. Stapler, asst. dist.-att'y, for respondents.

GRAY, J.—The defendant was charged with the crime of murder in the first degree, committed upon Helen Neil Potts by administering to her morphine in a large enough quantity to cause her death. His indictment was followed by a trial in the court of general sessions of the peace of the city and county of New York; at which he was convicted, upon the verdict of the jury. From the judgment of that court and from the order denying his motion for a new trial he appeals to this court. He says that justice demands that he should be granted a new trial for errors which he points out as having been committed

upon his trial, and because his conviction was not justified by, the evidence.

A careful reading of the evidence contained in this very voluminous record and a conscientious consideration of the facts disclosed must inevitably lead to the formation of an opinion that the verdict of the jury was not only justified, but that no other conclusion could have been reached by the fairest mind. The death of the young woman was not disputed; but the cause of her death was. The great bulk of this record is made up of the evidence given on behalf of the People to establish a poisoning by morphine as the cause of the death, and to demonstrate the guilt of the accused; while the evidence in his behalf was confined to the examination of several medical experts, for the purpose of proving that the death of the deceased might be attributed to other cause than to morphine poisoning. The evidence connecting the accused with the commission of the crime charged was wholly circumstantial. There was neither testimony by some eye-witness of the giving of the poison, nor of any admission by the accused.

All evidence is, in a strict sense, more of less circumstantial; whether consisting in facts which permit the inference of guilt, or whether given by eye-witnesses of the occurrence; for the testimony of eye-witnesses is, of course, based upon circumstances more or less distinctly and directly observed. But, of course, there is a difference between evidence consisting in facts of a peculiar nature and, hence, giving rise to presumptions, and evidence which is direct, as consisting in the positive testimony of eye-witnesses; and the difference is material according to the degree of exactness and relevancy, the weight of the circumstances and the credibility of witnesses.

The mind may be reluctant to conclude upon the issue of guilt in criminal cases upon evidence which is not direct, and yet, if the facts brought out, when taken together, all point in the one direction of guilt and to the exclusion of any other hypothesis, there is no substantial reason for that reluctance. Purely circumstantial evidence may be often more satisfactory and a safer form of evidence; for it must rest upon facts which, to prove the truth of the charge made, must collectively tend to establish the guilt of the accused.

For instance, if any of the material facts of a case were at variance with the probabilities of guilt, it would be the duty of the jury to give to the defendant the benefit of the doubt raised.

A fact has the sense of and is equivalent to a truth, or that which is real. It is in the ingenious combination of facts that they may be made to deceive, or to express what is not the truth. In the evidence of eye-witnesses to prove the facts of an occurrence we are not guaranteed against mistake and falsehood, or the distortion of truth by exaggeration or prejudice; but when we are dealing with a number of established facts, if upon arranging, examining and weighing them in our mind, we reach only the conclusion of guilt, the judgment rests upon pillars as substantial and sound as though resting upon the testimony of eye-witnesses. The necessity of a resort to circumstantial evidence in criminal cases is apparent in the nature of things. For a criminal act is sought to be performed in secrecy, and an intending wrongdoer usually chooses his time and an occasion when most favorable to concealment, and sedulously schemes to render detection impossible. All that we should require of circumstantial evidence is that there shall be positive proof of the facts from which the inference of guilt is to be drawn from those facts.

The two questions which, upon all the circumstances detailed in the evidence, the jury had to pass upon in coming to their verdict were, in the first order, whether the deceased came to her death by morphine poisoning, and having determined that in the affirmative, then whether the defendant was guilty of the charge of having administered it to her with a deliberate intent to cause her death thereby.

The extent of the case developed by the prosecution; some peculiar features of the evidence and some apparent difficulties suggested in connection with it; the gravity of the accusation under which the accused lay, and the responsibility imposed upon us by the statute in capital cases, seem to me to demand, for a clearer understanding of the correctness of the judgment, a somewhat extended review of the facts elicited upon the trial as they relate to each branch of the case.

Helen Potts, the deceased, had entered Miss Comstock's boarding school, in New York city, in December, 1890, and was

nineteen years of age at the time of her death.  On Saturday, January the 31st, 1891, in the evening, she was with Miss Day, the principal of the school, in the sitting-room, engaged in conversation and in reading.  She was and had been in good health, and seemed very cheerful and happy.  About ten o'clock Miss Day retired, and, a few minutes later, the deceased also retired to her room.  Her room-mates, three young girls, returned from a concert at about half-past ten o'clock.  The deceased awaked a few minutes after they came into the room, and talked with them.  She said that she felt as if she was going to die; that she felt a choking sensation, and could not swallow; that she felt numb.  She also spoke of having experienced pleasant symptoms, and of having had "such lovely dreams that she wished they would go on forever."  After they had gone to bed, they were awakened by the moans of the deceased. One of them arose, and with her hands rubbed her friend's head; but the deceased said she could not feel the rubbing.  The moans continuing, and the breathing becoming loud and hard, Miss Day was called in about midnight.  She tried to lift the deceased; found her unable to move, and unconscious, and immediately sent for Dr. Fowler, the physician of the school.  He came in about fifteen minutes, and was followed by an assistant physician, Dr. Baner.  The deceased was found in a state of profound coma; very cold and pale, and the surface of the skin was pale and blue, and covered with profuse perspiration. There were very labored respirations, of about two a minute, with a distinct interval between the inspiration and the expiration.  The pupils of the eyes were symmetrically contracted to an almost imperceptible point, and there was no sensitiveness of the surface of the eye-balls.  There was an entire inability for any voluntary motion whatever.

The two physicians immediately proceeded to apply remedies. During the night they kept up artificial respiration by certain movements of the arms; they gave injections of black coffee, and hypodermic injections of atropine, caffeine, whiskey and digitalis.  They used electricity and oxygen gas; but feared to use the stomach pump, believing, because of the very labored respirations, which had become reduced to one or two minutes, that the use of it would destroy life.  No such change was indi-

cated as had been hoped for in the use of atropine, and the only betterment apparent occurred after some three hours of work, when the respirations became more frequent. This improved condition lasted only about half an hour, when a relapse occurred, and the respirations decreased to only one in two minutes and a quarter. The patient gradually sank until eleven oclock on Sunday morning, February the first, when she died. Towards morning the attendant physicians had called in Dr. Kerr, another physician, to aid them. The symptoms of the deceased caused Dr. Fowler to think the case one of poisoning by morphine or opium. In the room was found an empty pill box, bearing upon its label the defendant's initials, "C. W. H., medical student," and Dr. Fowler, having sent for defendant, early in the morning, asked him about it. He was told that it contained capsules, each filled with about four grains and one-sixth of a grain of sulphate of quinine and one-sixth of a grain of sulphate of morphine. Dr. Fowler told him that one-sixth of a grain, or even one-grain, of morphine, could not have produced the condition; that it was one of the most profound cases of opium poisoning he had ever witnessed, and advised him to go at once to the druggist and see if any mistake had been committed in reversing the proportions of the drugs. This the defendant pretended to do; reporting shortly afterwards that the medicine had been prepared exactly according to the prescription, which was written by him.

I have thus related the occurrences covering the period of time between the retirement of the deceased, in apparent good health and spirits, and her death; being some thirteen hours. In the account of her condition, of her various symptoms, and of the treatment and results, the testimony of the attendant physicians agrees, and they all testified, in the most positive manner, that the deceased came to her death from an overdose of morphine. They based their testimony, in that respect, upon the appearance and existence of conditions upon and in the person which negatived or precluded the possibility of any other cause of death. Dr. Fowler, was a physician who had been over thirty-five years in extensive practice and whose experience covered many cases of opium poisoning. He testified that it was not an ambiguous case, and that the three stages, of

a pleasureable excitement, of coma and of the entire nervous prostration, with an almost entire dilation of the pupils of the eyes before death, were a group of symptoms which, in connection with other observable conditions of the patient, enabled him to state as a fact that she had had an overdose of morphine. To quote his language: "the whole condition from beginning to end was a picture of morphine or opiate poisoning, and a picture of nothing else." To questions embodying the facts relating to the conditions and medical treatment preceding the death of the deceased, addressed to physicians of high standing and experience, called as experts, they agreed in the expression of their opinions, that the cause of death was opium poisoning, and that the symptoms, as a group, indicated death from no other cause.

An autopsy was made some fifty-five days after death, in which the examination of the body was remarkably facilitated by its good state of preservation, a circumstance due to the fact that the body, having been embalmed, had been interred in a brick vault kept dry by the gravelly soil surrounding it. Two experienced physicians, accompanied by an experienced chemist, were present at the disinterment and at the autopsy following it. The physicians testified to finding no evidence of disease in the heart, or kidneys; nor were there any conditions of pregnancy. There was the congested appearance of the brain, which is described as a post-mortem evidence of opium poisoning. The chemical expert removed certain portions of the body, necessary to his proposed examination, and an elaborate analysis which he testified to in detail and at great length resulted in the finding of morphine in the contents of the stomach and in the membrane, and an absence of quinine in detectable quantities. It was testified to that quinine is as stable as morphine and should have been found, if it had been taken in similar quantity. It also appeared that the fluid used for embalming contained no morphine. It may be observed, in this connection, that as the deceased lived for twelve hours after being taken ill and as the absorption of morphine is very quick, the finding of morphine in the analysis of the contents of the stomach would be a fact significant of the taking of an excessive dose of that drug. A minimum dose to produce the conditions narrated of the de-

ceased would be, according to the evidence, from two to three or four grains. In connection with all this evidence of symptoms during the attack; of the results of the autopsy and of the opinions of medical experts, we have certain other facts bearing in an important degree upon the question. The deceased was described as a young woman of fine and healthful appearance and with a well nourished body. Excepting sick headaches, she had not been a sufferer from ill health, and there had been no evidence, and none was subsequently discovered, of any organic disease. That she had no constitutional idiosyncrasy as to morphine would seem well evidenced from her having been given, during the previous summer, in her illness, doses of one-quarter of a grain of morphine every three hours for some twelve hours and one-sixth of a grain thereafter every four hours for twenty-four hours. Furthermore, during some ten days previous to her last illness, she had taken three doses of one-sixth of a grain each, compounded with quinine, under a prescription of the defendant. The defendant endeavored, by the cross-examination of the witnesses for the People, to establish the theories of uraemic poisoning from a diseased condition of the kidneys; or of a hemorrhage of the pons varolii, a lower part of the brain. He also, on his own behalf, examined witnesses called as medical experts, who, in answer to questions embodying the same facts as propounded to the plaintiff's witnesses, testified that no accurate opinion could be given of the cause of death and that the symptoms were compatible with various conditions. He endeavored to cast a doubt upon the reliability, or the correctness, of the results of the autopsy and of the chemical analysis of the contents of the stomach. In connection with the possible existence of kidney disease, he sought to show that, with a constitutional idiosyncracy or intolerance for morphine, the effect of an ordinary dose of morphine would be to intensify the action of the drug and to produce symptoms similar to those observed. Without, however, discussing these theories in detail, and while fully alive to the fallibility of the opinions of medical practitioners, and being conscious of the inexactness of medical practice as a science, I am convinced that the jury could not have come to any other conclusion upon this evidence than that the deceased came to her death by mor-

phine poisoning. While, undoubtedly, cases of death do occur
of which an autopsy may not reveal the causes, and while the
evidence of witnesses did show that there were instances of
death from other causes than that of morphine poisoning where
some symptoms were exhibited similar to those observed in
this instance, the group of those peculiar symptoms, which are
admitted to belong to narcotic poisoning, considered with the
proof of a constitutional tolerance for the drug, and with the
positive testimony as to the discovery of morphine by subse-
quent chemical analysis, gave a base for a judgment as to the
cause of death which I see no way of doubting or of disturbing.
I may add that, in my opinion, which I derive from a careful
consideration of the professional evidence given, the theories
of uraemic poisoning, or of the hemorrhage in the brain, sug-
gested, were contradicted either by the actual combination of
symptoms or from the absence of essential symptoms. I may
instance that, as I understand it, the fact of the deceased being
able to speak with clear articulation and rationally when her
room mates returned and awakened her from sleep is signifi-
cant, and some thing which is not deemed possible where a person
is attacked with uraemic coma, or by hemorrhage of the pons
in the brain; while quite possible in the first stage of morphine
narcosis. The sense of exhilaration first noticed, from her re-
mark about having such pleasurable dreams, would not seem to
comport with any disease of the brain, or with uraemic poison-
ing. That symptom, with the comatose condition ensuing, with
the symmetrical contraction of the pupils of the eyes to an
almost imperceptible point, and their lack of sensitiveness, and
with the peculiar respirations, were all symptoms usually found
together in narcotic poisoning. The determination as to the
cause of death can rest, in my judgment, safely upon a group of
symptoms which invariably accompany and characterize poison-
ing by opium or morphine, upon the subsequent revelations by
autopsy and analysis, and upon the previous constitutional
conditions of the deceased, all of which together preclude a
diagnosis of any other physical disturbance differing from that
made.

The question of what was the cause of death was one the de-
termination of which, upon sufficient evidence, belonged to the

province of the jury, and the statement of my opinion has been made solely to express a conviction that the necessary prior determination of that question by the jury was altogether correct. We have no right, and there is no reason, to interfere with the judgment on this branch of the case.

I come now to the next question, which was for the jury to determine, and that was whether the defendant was guilty of the charge that he had administered the morphine poison to the deceased with the intent to kill her. The evidence upon which this question turned was, as I have said, circumstantial, or indirect, and it will be necessary at some length to review it, in order to appreciate its probative force as a whole.

The defendant had formed the acquaintance of the deceased, in the summer of 1889, at Ocean Grove, New Jersey, where her family were residing. When they moved to the city of New York, for the winter, the acquaintance continued, and on February 8, 1890, obtained a permission from her mother to take her to see the stock exchange, he went with her before an alderman, and they were married under the assumed names of Charles Harris and Helen Neilson. He was, at the time, pursuing his studies as a medical student in that city, and he continued to visit the deceased until her family returned, in May following, to Ocean Grove. He followed them there soon afterwards. Mrs. Potts, the mother of deceased, testifies that there was a falling off in his attentions to the deceased, and a marked change appeared in his manner towards her, which seemed to worry her. A young friend of the deceased, Miss Schofield, coming to visit her in June, upon the occasion of a walk, the defendant informed her, because, as he said, the deceased had insisted upon it, that they were secretly married. Upon Miss Schofield's saying she should beg the deceased to tell her mother, the defendant became very angry, and said she should not do so; that his prospects would be utterly ruined, and that he would rather kill her (the deceased) and himself than have the marriage made public, and expressed the wish that "she (the deceased) were dead and he were out of it." Later in the day he went out with the deceased; was absent for several hours and upon their return to the house, she appeared pale and ill and went directly to her room. Shortly after this, in the lat-

ter part of June, she went to Scranton, Pennsylvania, and vis-
ited an uncle, Dr. Treverton.    While there Dr.Treverton discov-
ered that she was with child and treated her accordingly; but,
subsequently, was obliged to remove from her a foetus of five
months formation and which had been dead for some time.
After the operation she recovered her health completely, and
returned, in the first part of September, to Ocean Grove.

While she was at Dr. Treverton's, and almost the end of July,
the defendant came, upon a telegram from the deceased and a
letter from Dr. Treverton, and remained a few days.    The oper-
ation for the removal of the foetus was made while he was
there.

Dr. Treverton testified to conversations with the defendant,
upon the occasion of his visit, in which defendant said he had
performed two operations upon the deceased, and had thought
everything was removed.    He boasted of his previous intrigues
with other women, and of his success in not having any trouble
before.    His remarks are unnecessary to be wholly repeated,
from their revolting depravity; but, in the course of them, he
said he had been "secretly married to at least two young ladies,"
and by one had a fine child.    During the same visit he had a con-
versation with the witness Oliver, then visiting the Treverton's,
in which he spoke boastingly of his experience with women and
of the facility with which he could gain sensual control of
them.    He said that in two instances he had overcome their
scruples by a secret marriage ceremony, but was ready to stand
by them.    Upon the witness asking him how he could stand by
both, he answered, in substance, that there would be no trouble,
as the first one was glad to be rid of him, and he went on to tell
the circumstances of their relations and, as the final result, that,
after a child was born, the woman expressed her disgust with
him and wanted to see no more of him.    To neither Treverton nor
Oliver does it appear that he admitted a contract of marriage
with the deceased.

While the deceased was at Treverton's her mother joined her,
and learned of the secret marriage and what had happened.

In the first week of September, the defendant was at a hotel
in Canandaigua, N. Y., under an assumed name, with a young
woman named Drew.    His conduct towards her was demon-

strative in its affection, and her friends there, discovering their illicit relations, compelled him to leave. During his stay witness Latham overheard a conversation between him and the Drew woman, in which he advised her to marry some old gentleman with lots of money, and, upon her asking what if she did, he is said to have replied: "Oh, we can put him out of the way," and, upon her inquiring how, he further said: "You find the old gentleman, and we will give him a pill; I can fix that." After the return of the deceased and her mother from Scranton, they met the defendant in New York city and lunched together. They talked about the secret marriage, of which the mother had been informed at Scranton. He offered to satisfy Mrs. Potts of its legality, and took her to the office of his lawyer, Mr. Davison. The defendant told her he had burned the original marriage certificate, but sent for and obtained a copy from the records, and, upon Mr. Davison's suggestion, attached to it an affidavit, made by him, stating his marriage with the deceased under assumed names before an alderman. During a conversation at the office, he asked if Mr. Potts knew of the marriage. She said it was no time to tell him then, and asked him if he had told his mother. He said: "No, he would not have his family know of it for half a million of dollars." He suggested to Mrs. Potts that if she was so unhappy about the marriage, it could easily be broken, and no one would be the wiser. Upon her expressing herself in indignant refusal of the suggestion, and insisting upon a "ministerial" marriage, he objected to it at the time, alleging as an excuse that it would connect her name with certain club scandals, in which he was involved at Asbury Park. He promised, however, to have the ministerial marriage at any time in the future that Mrs. Potts should say. He expressed his gratification at her not pushing the matter of the marriage at that time; that if she had, he would have been obliged "to leave everything and go west." Upon that occasion, he suggested putting the deceased at Mrs. Comstock's school to fit her, as he said, for the society in which they were to move, to which suggestion Mrs. Potts acceded. At his request, she promised to write to Dr. Treverton, and express her satisfaction with the marriage, and to prevent the doctor from making any trouble for him at the medical college, as he had all

he could do, he said, to meet the charge of keeping a disorderly house. Upon leaving the lawyer's office, they joined the deceased at the ferry, he crossed with them. The deceased learned of her mother's being satisfied about the marriage, and she seemed to be made very happy in consequence. In December the deceased was placed at school, and, as a friend of the family, the defendant received permission to visit her. During her visit to her home in the holidays he wrote to deceased, asking that no announcement should be made of their engagement at this time. In reply to a letter from Mrs. Potts, in the first week of January, he wrote suggesting that there should be no further question of marriage for two years longer, and that her daughter should take a collegiate course. About January the 18th or 19th Mrs. Potts wrote to defendant, expresing herself strongly upon the hardship of her daughter's position, with a delay of three years as an acknowledged wife, and for no apparent reason; that her daughter's illness at Scranton had been commented upon; that if he should die, it would be humiliating to publish a marriage under the circumstances of its contracting; that her husband might meet Dr. Treverton and be told of the illness at Scranton and of the doctor's doubts about a marriage. She concluded by asking him to keep his word, and to do as he had promised her, and demanded of him to go, upon the anniversary of the first marriage, February the 8th, and be married before a minister of the gospel, and give her the certificate to hold, which she would make public at such time as she chose. To this he replied that he would do all she asked of him, if no other means of satisfying her scruples could be found. On Tuesday, January the 20th, a day after he received Mrs. Potts' letter, the defendant went to the shop of McIntyre & Sons, druggists, in New York city, and at first ordered some capsules of sandal wood to be put up. Upon the clerk's mentioning that it would take some time, he said he could not wait. He then handed the clerk a prescription, asking if it would take long to prepare, and, upon learning that it would take a few minutes, waited for it. It called for twenty-five grains of sulphate of quinine and one grain of sulphate of morphine, mixed in six capsules, with a direction to take one before retiring. The prescription was put up by the clerk with minute care, being

aided by another clerk, who checked the amount and weight of the morphine, according to a custom adopted where poisons are put up. The box, properly labeled, containing six capsules, each capsule containing one-sixth of a grain of morphine and four grains and a fraction of quinine, was taken by him. He never called for the sandal-wood capsules. The following day being Wednesday, January 21, he was at the school reception and saw the deceased. The testimony in the case shows that the defendant stated to both coroner and deputy coroner, when shown and asked about the pill box taken from the room of the deceased, that it was the one that he had given to her on Wednesday, January the 21st, and he described the prescription as above, stating that he had given it to her for headaches, and that he had given her only four of the capsules. It was also shown by the testimony of several witnesses from the medical college that in the latter part of December and the first part of January lectures were given upon opium and its effects when used feloniously. The sulphate of morphine, contained in wide-mouthed bottles, had been passed around among the students, of whom the defendant was one, and they were allowed to take it out and to handle it when they chose. After meeting the deceased at the reception on Wednesday, January the 21st, the defendant left for Old Point Comfort, Va., and did not return until a week later. While there, it appears that she wrote to him that the medicine had not relieved her headache, and rather made her worse; to which he replied, advising her to continue taking it. On Saturday, January the 31st, the deceased, her mother and the defendant met at the school and walked together. The deceased seemed perfectly well, and very bright and happy. Mother and daughter returned to the school, and, when in the bedroom of the deceased, she showed her mother the pill box, with one capsule left in it, and remarked she had been taking some capsules that Carl (the defendant) had brought her. She complained of their making her feel ill, and of her dislike to take them. She said she was tempted to toss it out of the window, and then tell Miss Day, the principal, she had taken it. Her mother advised her to take it, remarking that quinine was apt to make one feel wretched, and that she might have been malarious.

Her mother left and then occurred the scenes of illness and death in that night, which I have before described. The defendant was sent for towards daylight by Dr. Fowler, who, stating that he believed it to be a most profound case of opium poisoning, wished to learn what had been contained in the pill-box in her room, and which not only was the only evidence of anything like medicine about the room, but which, according to her room-mates, was the only medicine in the room that day. The defendant told him what had been its contents and of his having prescribed the capsules for headache, insomnia and the like. Dr. Fowler said one-sixth of a grain could not produce the condition and advised him to go at once to the druggist and to ascertain if the proportions of the drugs had been reversed. He pretended to go immediately and, when he shortly after returned, stated to Dr. Fowler that the medicine had been prepared exactly according to his prescription.

The evidence shows that he did not go to the druggist's that morning, as supposed by Dr. Fowler; nor until eleven o'clock and after the death, when Dr. Kerr told him to go and try to get the original prescription if he could. During the time he was in the room where the deceased lay, he surprised the physician by his composure and general lack of interest, or of affection, except when upon the death he exclaimed "My God, what will become of me?" He spoke to the physicians of being "somewhat interested in the girl," and mentioned a possible future engagement to her. He asked them repeatedly if they thought he could be held responsible for the death. To them and to the coroner he said he was merely a friend of the deceased, and pretended hesitation as to her correct given names. In the evening of the Sunday he met Mrs. Potts at the ferry house, and stated to her that her daughter had died of morphine poisoning, and represented it "as the druggist's awful mistake." Mrs. Potts says, when she told him as the deceased was the mother of his child she must be buried under his name, that his terror was frightful and that he said it could not be; that he would do anything, but that the knowledge of the marriage coming at this time would destroy him; that he would "answer just the same if it was Queen Victoria's daughter, she cannot be buried under my name;" and he urged, as a pretext,

consideration for the reputation of the school. The coroner met them at the school in the evening. The defendant said he had one of the capsules prescribed for the deceased, and gave it to the coroner; telling him to amalyze it and it would be found all right. Subsequent chemical analysis of it proved the correctness in preparing the prescription. The mother, in order, as she says, to get a permit to take the body, as soon as possible, out of the house and to New Jersey, represented falsely, as she also admitted, that her daughter had heart trouble. She left the next day with the body. Some days later the defendant stated to Dr. Hayden, in conversation about the occurrence and when rebuked for writing prescriptions, that "these capsules would not hurt any one and no jury could convict me, because I have two capsules which can be analyzed and be found to contain the correct dose."

Of the druggist's clerk, witness Powers, at an interview at the store on February seventh when obtaining some medicine, he asked if he had seen the account of the death in the papers and whether he believed it, and, upon the witness expressing his belief that the girl died of heart disease, he said "So do I." They talked about the putting up of the prescription, and the defendant said there was no doubt it was all right. To Dr. Peabody, whom he went to see with an introductory letter from his medical perceptor, a day or two after the death, and to whom he stated the circumstances attending it, he described the prescription, and for what given, and alleged, as an excuse for keeping out two of the capsules, that it was injudicious to put as much as a grain of morphine in a girl's school. Later in February, in a conversation with Dr. White, he said he did not know whether the druggist had made a mistake, or whether there was a brain tumor, which would account for the fact that the morphine in the capsule had been the cause of death. A few days before the coroner's inquest, which was held on February 27th, the defendant met Mrs. Potts, and said that the coroner's inquest would exonerate him and that he was innocent, and, upon her remarking "If innocent, how did she die?" he replied that "It was the druggist's mistake." She asked how that could be when he had said the capsules upon being analyzed would prove it to be all right, and said the statements conflicted. He

merely replied that he would have the capsules analyzed himself. He ascertained from her that neither Mr. Potts or Dr. Treverton knew of her fears. He then endeavored to obtain from her the affidavit of the marriage, saying that he must have it; that it was more valuable than he dare tell her. She said he could not get it; "it is not here."

Perhaps at too great length, I have given in chronological order, from his very large record, the salient occurrences of the year elapsing between the secret marriage and the death of the young wife. In my opinion, it offers the advantage of furnishing a view of the events which aids the judgment in apprehending their several and collective force upon the questions of the defendant's connection with the cause of death, of an intent to put her out of the way and of the existence of a motive for such an act. Taking them in any combination, is there anything to help out the presumption of the defendant's innocence, and do not every incident and fact, with greater or less significance, form a chain of circumstantial evidence, which subjects and holds him to the consequences of an intentional destruction of the life of the woman, to rid himself of whom no other way seemed open? I can reach no other conclusion. Unable to gratify his passion for her, except by making her a wife, he persuades her into a secret marriage under assumed names. He soon tires of her. He endeavors unsuccessfully to remove the fruit of their marriage. He forms an illicit connection with another woman, to whom, with greater or less seriousness, he proposes a scheme for her enrichment by a marriage, with a way to again becoming free which suggests his sharing in the result. He forbide his wife to tell of the marriage; he manifests anger when her friend, being told of it, says the mother should be informed; wished his wife dead and said he would rather kill her and himself than to have the marriage made public. When her mother learns of it and presses for a public marriage, with sacred forms, he lulls her suspicions by showing the marriage to be legal and gives her an affidavit; he puts off its announcement on pretexts; he persuades her to put her daughter at school to train her; he again tries to put off the publicity of marriage for two years longer, and when, finally, the mother insists upon a clerical marriage on the anniversary of their secret marriage,

he pretends to assent. Immediately he prescribes for the deceased a remedy of quinine and morphine in capsules, harmless to life, but improper, as it was said, for the trouble prescribed for. He awaits the preparation by the druggist of those capsules, though he could not wait for the other order, and he retains them in his possession until the following day, when he gives to the deceased four of the six capsules. He immediately leaves the state and is absent for a week, for no apparent cause. He wrote to her to continue taking them, despite her objection that they affected her unpleasantly and gave her no apparent relief. He returns and she has taken three of the capsules; the remaining one she thought of throwing away, but is advised by her mother to take it. A ghastly incident, I may remark, in this tragedy. Immediately she sickens and dies, with every symptom of what the physician describes as profound morphine poisoning. She had good health. She had no motive to kill herself. She was happy and cheerful and before her lay the prospect of the announcement of her marriage and the freedom from the burden weighing upon her conscience. The defendant had acquired some knowledge of morphine and its effects about the time at his medical lectures, and he had the opportunity to obtain the drug there, if not elsewhere freely procurable. In the retention of the capsules for a day he had the opportunity of substituting in one of them the poisonous dose of morphine. There was motive for the crime in the fear that discovery would inculpate him as a bigamist, because of his previous secret marriages; and, subordinately, there may have been the motive, with his utterly depraved nature, to prevent putting an end to his apparently successful career of seducing and ruining young girls. He had a motive in a fear, if he persisted in his refusal to acknowledge her as his wife, of the social, professional or legal consequences to himself, if his operations to cause a miscarriage and which killed the child in his wife's womb should be revealed. The terror, and the agitation of fear, which he manifested to Mrs. Potts, when it was a question of publishing the marriage, plainly had their source in some great fear of the serious consequences to himself. His irreconcilable statements to some that the druggist must have made a mistake and to others that the prescription had been put up all right; his

extraordinary conduct upon the morning of the day of the death, in professing to have complied with the physician's request to ascertain from the druggist if there could have been a mistake in the proportions of the drugs; when, in fact, he never went there until after the death; his composure and utter absence of affection, or of emotion, at the death bed of his wife, until, when dead, he expressed only fear of being held responsible; his subsequent endeavor to get from Mrs. Potts the marriage certificate and affidavit and, I may add, his unintelligible act in reserving for future exhibition and evidence two of the six capsules, all of his conduct envelopes him with the atmosphere of guilt and is inexplicable except upon the theory of guilt.

In the chapter of events, it was written that their happening would be in such order as to subvert the probable expectations of the defendant. Instead of taking the poisoned capsule among the first, in which case the defendant would have been absent and thus could not have been associated with the scenes of death; it so happened that it remained as the last one to be taken. Had it been taken earlier, the remaining capsules would have exhibited, by analysis, the harmlessness of their preparation. Then, too, instead of taking the capsule under the presumably usual circumstances of retiring to bed, it so happened that she took it while her room-mates were out for the evening at a concert, and their return, awakening her so soon after going to sleep ,enabled them to observe her condition and to give evidence in that respect important in aid of the discovery of the cause of death. By the alarm created, the attendance of physicians was secured, through whose observations and efforts further important evidence was added, relating to the conditions and symptoms of the deceased. Had these events not occurred, it is probable that she would have passed, in her sleep, from life into death, and the difficulties of detection would have been added to.

It is my opinion too that there was strong evidence of the defendant's guilt in the fact that in no way under the circumstances, do I see that the druggist could have made such a mistake in putting up the prescription. The three capsules first given to and taken by the deceased were harmless, as were the two retained out by the defendant, and the fourth must have

contained the poisonous dose upon taking which the deceased was immediately seized with illness. In no way that I can conceive of could the druggist have reversed the proportions of the drugs in only one capsule. Any mistake of his would have been evidenced in all of the capsules. In the absence of some inconceivable design on the part of the druggist to administer a poisonous dose, his mixture of sulphates could not but have been substantially correct. One capsule could not have been charged with a dose of three or four grains of morphine, sufficient to take life, while the others were harmless, and those retained by defendant and submitted to chemical analysis were shown to be according to the prescription. In the case of a mistake by the druggist, either the deceased would have been affected before, or the capsules reserved by defendant would have revealed the mistake if he spoke the truth.

In my opinion the evidence not only warranted the verdict of the jury, but I do not see that any other could have been rendered which would be consistent with the evidence.

Evidence, as I have suggested, is not to be discredited because circumstantial. It has often more reliable elements than direct evidence. Where it points irresistably and exclusively to the commission by the defendant of the crime, a verdict of guilty may rest upon a surer basis than when rendered upon the testimony of eye-witnesses, whose memory must be relied upon and whose passions or prejudices may have influenced their testimony. If, taken together, it leads to a conclusion of guilt with which no material fact is at variance, it constitutes the higher form of evidence which the law demands where the life or the liberty of the defendant is at stake, and neither jurors nor the court can conscientiously disregard it. Nor can I think that the conclusion of guilt is unduly influenced by the unusual depravity of nature which the evidence exhibits in the defendant. The evidence seems to overwhelm the accused with his guilt, and leaves the mind unfitted to accept any other belief than that he intended to make away with his wife in order to free the field of his own life, and to escape from the imminent danger of disgrace or punishment, and that with cold deliberation he planned her death by methods which should conceal him as its author. The circumstances preceding and attendant upon the death of

the deceased were such as to associate him inevitably with its cause and to forge the chain which has drawn him to the bar of justice.

The successive steps in this drama seem plainly defined from the secret marriage, on February the 8th, 1890, up to the tragic close of the victim's life, on February the 1st, 1891. There were the weariness following upon satiety of desires; the destruction of the fruit of the marriage he had been obliged to contract in order to possess the woman; the continued effort to avoid disclosures which would jeopardize his reputation and perhaps his liberty, lulling the mother into fancied security and into a satisfaction with a temporary concealment of the marriage; and finally, when pressed and no longer seeing a way to put off disclosure, he accomplishes the destruction of his wife's life, a few days before the date set for the fulfillment of his promise to have the ceremonial marriage. I think that justice does not demand that this defendant should have a new trial, unless there were errors committed upon the trial in the admission or exclusion of evidence, or in the charge of the recorder, which affected any substantial rights of the accused. As his counsel has insisted upon their existence, it is necesary that some of the errors which he pointed out should be carefully considered by us.

He insists that it was error to receive the testimony of Dr. Treverton, a witness for the People. He was uncle to the deceased; with whom she remaind for some two months at Scranton, and who operated upon her and removed a dead child of five months. The objection relates to his testifying to a conversation with the defendant, and is based upon its being privileged, under that statutory prohibition which seals a physician's mouth; and upon its tending to prove the defendant guilty of another crime; namely, of abortion. The first ground of objection is untenable for several reasons. In the first place, the witness was not employed by the defendant. In the second place, he acquired no important information from the defendant, or any which he was not already possessed of, or which was necessary for him in order to act in a professional capacity. Lastly, the statutory privilege was not conferred to shield a person charged with the murder of the patient, as was held in Pierson v. People, 79 N. Y. 424. I should never be willing to as-

sent to a construction, or to believe in a legislative intent, which would operate to convert a statutory provision protecting a patient from a damaging or objectionable disclosure into a protection for a person on trial for the murder of the patient.

The second ground of objection is also untenable, because the evidence shows, or tended to show, the existence of motive on the part of the defendant. It went to show the endeavor of the defendant to keep the marriage secret. To prevent the obligation of having to recognize the marriage, he endeavored to destroy the fruit, and had been willing to do that by criminal means. Then the knowledge by the mother and uncle of this criminal act placed him more or less in their power to compel him to comply with their request.

The remarks upon the question of privileged communications in the instance of Dr. Treverton's testimony, to the effect that the statute should not be construed to be applicable to protect a person accused of the murder of the patient, apply to Dr. Hand's testimony, and with even greater force to the instances of the testimony given by the physicians Fowler, Kerr and Baner, who were called in to attend the deceased upon the night before she died.

The testimony of the witness Oliver, disclosing a conversation with the defendant, in which, after boasting of his previous extensive intercourse with women, and of his successful methods for violating their persons, he admitted having previously contracted two secret marriages, made necessary to overcome the scruples of the woman, was clearly admissible on the question of motive. It threw light upon it. With a previous secret marriage, the publicity of his later marriage with the deceased would have stamped him a bigamist and have ruined his reputation, if it would not have subjected him to criminal prosecution.

The argument against the admissibility of the evidence of the witness Latham presents more difficulty, perhaps, at first glance; but when we consider the importance of showing motive in a case where the evidence to charge the accused is wholly circumstantial, the difficulty disappears. It may be remarked, in connection with this evidence from the witnesses Latham and Oliver, that while evidence merely to show bad

and vicious character is inadmissible against one on trial for the commission of a criminal offense, if the depraved acts, offered to be shown, evidence, or throw light upon, motive, they become admissible. That the accused has suffered from the unconscious influence upon opinion of the record of a bad life is not to be assumed as against jurors who have sworn to convict upon evidence only which establishes the guilt of the accused.

The evidence of witness Latham exhibited the defendant with a young woman at a hotel in Canandaigua, in September, 1890, and proved that they held illicit intercourse with each other, and that a conversation was overheard in which the defendant suggested her marrying some old man with plenty of money, and that if she found one, they would give him a pill and get him out of the way. I consider that this evidence was admissible, because it bore upon the question of motive, and tended to repel that strong presumption which would militate in favor of a husband when on trial for the murder of his wife. The rule that evidence in criminal cases should be confined strictly to the question in issue is not infringed upon because the evidence offered while tending to prove some essential fact in the guilt of the accused, may also prove the commission of another offense. Such evidence is relevant and admissible whenever its presence goes to sustain the charge by showing scienter or motive; for these facts are essential elements of a crime. People v. Stout, 4 Parker's Crim. 71.

So, in the present case, proof of the existence of the element of motive is aided, in some degree, by showing what were the defendant's relations and feelings towards his wife, as evidenced by his conduct and his remarks when with others.

Wharton, in his work on Criminal Evidence, says (§ 51), that on the trial of a husband for the murder of his wife, the state has a right to prove his adultery with another, as illustrating a desire to get rid of the marital relation; and he cites in support of the rule People v. Stout, supra, and several other authorities in other states. In People v. Stout, the defendant was accused of the murder of Little, and the prosecution offered evidence to show incestuous intercourse between defendant and Little's wife, who was defendant's sister. The evidence was held admissible to show motive and that it was no objection that

it tended to prove a distinct felony, namely: the incest. Welles, J., with whom Johnson and Smith, JJ., concurred, delivered the opinion of the general term in that case, and they placed its competency upon the ground of its establishing a motive to get the deceased out of the way. And see State v. Watkins, 9 Conn. 47.

The evidence of witness Latham tended to show that defendant had ceased to hold his wife in such affection as the law presumes to exist from the marital relation. It tended to contradict the existence of natural motives to prefer, cherish and care for her. The real difficulty in the propriety of the admission of this testimony relates to the suggestion of the defendant to the Drew woman, in this conversation, that if she found and married some old man with plenty of money, he could be gotten rid of by a pill. If this testimony was irrelevant upon the question of motive, it was not material upon the point in issue, and its effect could hardly be other than to prejudice, more or less seriously, the defendant in the minds of the jury. But such testimony was relevant upon the question of motive. It strongly characterized the nature of the defendant's intentions with this woman and illustrated their closeness and the underlying intensity of feeling.

The evidence of an illicit intercourse went to exhibit what were the defendant's feelings towards his wife and bore upon his desire to get rid of the marriage relation; but the further evidence, in what he proposed to his mistress that she could or should do, went to exhibit how strongly he desired the permanence of their relations and to point out a way by which, in the future, they could secure that permanence with such advantages in their surroundings as the possession of wealth would procure. If this conversation, so overheard by the witness, furnished any clue to the existence of motives, we cannot assume, nor say, that it was meaningless or immaterial. The weight and importance to be attached to it were for the jury to consider in the light of all the circumstances. It did tend to prove that the defendant's feelings towards his mistress were not transient, or ephemeral, in their nature, but that they were sufficiently intense to give rise to a desire that their relations should be made durable. His marriage was unknown, and he was determined

that it should not be made public. He saw a way, which his strong passion for the woman led him to propose; by which, through a criminal act, they might be able to continue together in the future more advantageously. To this she listened. What was the situation? The adulterous connection had assumed such intensity of character that a scheme was broached and listened to, which in its conception indicated, and in its execution would menace, jeopardy to the life of defendant's wife, for its very hostility to the restraints of the existing marriage tie. Its adoption bound him and his paramour closer together in a partnership in a criminal project, and placed each, more or less, in the power of the other. I think these considerations are sufficient to show the relevancy of the evidence, as characterizing the exceptional nature and intensity of the adulterous relation, and, in that respect, bearing upon the existence of motives to get rid of his wife.

It was none the less relevant as indicative of this genuine and powerful motive because it tended to show the tendency of his mind, and that he regarded marriage as a means to an end, and the marital relation as but a light burden, from which relief could readily be obtained by the skillful and secret use of a deadly pill.

It was proper for the jury to receive and to weigh, in connection with all the other circumstances, and in considering the probabilities of the defendant's harboring an intention, unrestrained by the ordinary influences of love and affection, or the fact of marriage, to destroy the life of the deceased.

Many cases might be referred to, in this state and elsewhere, where any evidence is considered to be admissible, if illustrating the mutual relations and the relative feelings of husband and wife, where one is on trial for the murder of the other. This link in the evidence to charge the defendant was of itself inconclusive, of course; but it was not wholly irrelevant or immaterial, to be considered upon the existence of motive. It contributed some strength to the chain of circumstances, because it tended to eliminate that weakness which otherwise it would possess from the natural abhorrence of the mind to presume a capacity in the defendant for such a crime upon his wife.

A motion was made to strike out evidence as to the disappear-

ance of a letter from Dr. Fowler to Mrs. Potts, upon an occasion
when the defendant was in her room, and the denial of the mo-
tion was excepted to. The argument is that it tended to throw
discredit upon defendant as indicating his having abstracted it.
The evidence of Mrs. Potts had been received without objection
being made. Subsequently, when the motion was made and de-
nied, the recorder, after a discussion, instructed the jury that
the evidence simply established the fact that the letter received
by Mrs. Potts subsequently, was missed by her, and that they
were not to connect the defendant in any way with the letter on
the evidence. On both grounds the matter of error is disposed
of, and there is no room for any argument that the defendant
was prejudiced.

Certain hypothetical questions asked by the defendant's coun-
sel of medical experts, who testified for the People, were ex-
cluded, and the error of their exclusion is argued. Inasmuch
as there was no foundation in the case for the facts assumed by
the questions put, the ruling was correct. Such questions, to
be properly asked of purely expert witnesses, must rest upon
facts which are either admitted, or which, being in conflict upon
the evidence, the jury are to pass upon.

I see no reason for discussing any other assignments of error.
None were important or prejudicial to the defendant. The
charge of the recorder was remarkably able in its exposition of
the law, most impartial in its presentation of the facts and very
clear. He instructed them that "if the facts and circumstances
taken together are susceptible of two constructions, one point-
ing towards guilt and the other towards innocence, in criminal
cases, the accused is bound to receive the most favorable con-
struction;" and again, he said to them that, before the defendant
could be convicted, "the evidence must satisfy you of his guilt
beyond a reasonable doubt. * * * The district attorney
must establish to your satisfaction and beyond a reasonable
doubt the guilt of this defendant." Indeed, the counsel for the
accused only finds it necessary to present in his brief as an error
the refusal of the recorder to charge the fifth request, which was
that the jury should always act upon the presumption that the
accused was innocent, and should reconcile all the circum-
stances with that side of the question. The recorder had pre-

viously received written requests from defendant's counsel, and when asked by him, after the conclusion of his charge, what had been his disposition of them, he said that if there was anything in them not embraced in the charge, he might except; whereupon he excepted specifically to the refusal to charge each request. The particular request now in question, I think, had been fully covered and, its matter emphasized by the charge, and the refusal to specifically charge it was discretionary and constituted no error to the prejudice of the defendant.

Upon the most careful consideration of this record and of the questions raised by that consideration, or by the counsel for the appellant, I fail to discover the existence of any substantial errors and, in my opinion, no ground exists for awarding to him another trial upon this indictment.

Some questions are raised and are discussed in the appellant's brief in relation to the empanneling of jurors. Some are covered by the opinion of this court in People v. McGonegal, lately handed down, and need no discussion here. The others suggest no error in the rulings.

The judgment, therefore, should be affirmed.

All concur.