■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v ODILIO RIVERA, Also Known as J. D. ODI, Appellant.—Judgment, Supreme Court, Bronx County, rendered March 14, 1977, after trial without a jury, convicting defendant of criminal sale of a controlled substance in the first degree, is reversed, on the law and the facts, and vacated, and the indictment dismissed. The facts here are that the police were investigating the defendant. Working with Sergeant Buccino was a confidential informant, one Murray Pritsky. On September 5, 1975, the police were going to use the informant to make a purchase of narcotics. The informant was to be equipped with two devices to electronically record and transmit conversations; another officer was to overhear the conversation between the informant and the seller. The informant was searched to make sure he had no narcotics on his person, and was to be alone at the sale but under the surveillance of the police. He was also given $1,500 to make the buy. On September 5, the officer and the informant met in Brooklyn and the informant telephoned someone (and we have no firsthand identification of the defendant) to advise him that Pritsky was on the way to see him. The informant and police arrived at an address in The Bronx at approximately 11:30 P.M. Buccino says that he saw the informant enter the building. The officer received the transmission of several voices, one of which he identified as the informer's, and one of which he identified as the defendant's, having heard the defendant speak when he was arrested a few months later. Buccino later met the informant in another part of The Bronx and received a plastic bag that contained narcotics. The narcotics and the tape cassettes were locked away by the police. On September 15, 1975, Buccino had

Pritsky call the defendant and they discussed, in street terms, narcotics. At trial, Pritsky, the informant, remembered very little and stated, regarding his voice on the tapes, "do I recognize them? It sounds like a gangster, it doesn't sound like me. I don't remember that." There was so much that Mr. Pritsky did not remember that the court declared him a hostile witness. In order to convict for a criminal sale under subdivision 1 of section 220.43 of the Penal Law the People have the burden of establishing beyond a reasonable doubt that the defendant (a) knowingly and unlawfully (b) sold (c) a preparation, compound or mixture of aggregate weight of two or more ounces containing a narcotic drug, and if any of these elements is not proven, there can be no conviction. The best evidence of the sale would require the testimony of Murray Pritsky, whom the prosecution alleges, purchased the narcotics from the defendant on September 5, 1975. We have no testimony of the sale from Pritsky; therefore, we must rely upon circumstantial evidence, or evidence of a collateral fact or facts, that is, a fact or facts other than a fact in issue, from which fact, either alone or with other collateral facts, the fact in issue may be inferred (see Richardson, Evidence [10th ed], § 145). Neither of the police saw or had personal knowledge that the defendant was in the building on East 176th Street on September 5, 1975; all we have is Buccino's testimony and he was monitoring a transmittal from the informant. Buccino testified that he was able to pick up "numerous" other voices in addition to those of the defendant and the informant. It is also noteworthy that although testimony characterizes the tape of September 5, in large part, as inaudible, Buccino was able to pick out the defendant's voice when he played and replayed it. Further, nowhere in his examination does he say that he heard the details of a sale being transmitted though he testifies that he had the KEL device in operation as he sat in the car around the corner from the house on 176th Street. Given the fact that there were several people in the building with Pritsky and presuming *arguendo* that there was a sale, and we have no testimony from Buccino that he heard the details of a sale, the question arises as to which of the voices sold the narcotics. Presuming that one of them made the sale, was it the defendant or one of the others? Were they all part of a conspiracy, or were they casual visitors to the premises with no interest in the traffic? We have no evidence as to the defendant's relationship to either the informant or the other voices in the room on September 5, 1975. Pritsky gave the police a bag containing narcotics, presumably as a result of his contact with the defendant. In the absence of proof that he received same from the defendant, the possibility arises that he might have received it from some unidentified person or that it was his, cached in the building for such an opportune time as this. Neither of the police saw the informant leave the building; the only testimony we have is that he had the plastic bag when he got into the car with Officer Indimine. For the trial court to rely on its common sense, reason and experience, as suggested by the dissent, and couple them with tenuous and imperfect proof, is to make a shambles of a judicial process which requires proof beyond a reasonable doubt. An inordinate amount of inferences have been drawn from other inferences. Even giving as liberal an interpretation as possible to the identification and confirmation of a sale the People sought to establish through the conversation of September 15, 1975, and conceding that the two were discussing narcotics, there is nothing to indicate that the defendant sold narcotics to the informant on September 5, 1975, as is set forth in the indictment. What there is is at best circumstantial and does not satisfy the standards of circumstantial evidence as set forth in *People v Bennett* (49

NY 137). We require positive proof of the facts from which the inference of guilt may be drawn, and that the inference of guilt is the only one which can reasonably be drawn. *(People v Harris,* 136 NY 423.) The trial court had no difficulty placing the defendant in the company of the informant, but we are confounded as to how the necessary elements of (a) a knowing and unlawful (b) sale of a (c) preparation, compound or mixture of aggregate weight of two or more ounces containing a narcotics drug, could have been established beyond a reasonable doubt. The People have not borne the burden of proving beyond a reasonable doubt all the elements necessary for conviction under section 220.43 of the Penal Law, and the conviction is reversed and indictment dismissed. Concur—Birns, Evans and Lane, JJ.; Lupiano, J. P., dissents in the following memorandum: At the outset it is noted that this was a nonjury trial, defendant having waived a jury, and the Trial Justice was both finder of fact and of law. In the evening of September 5, 1975, police officers, utilizing an informant, made preparations for a "buy" from an alleged known cocaine dealer, defendant Odilio Rivera. Testimony of the police elicited at trial is as follows: The officer in charge, Sgt. Buccino, searched the informant to ensure that he carried no drugs into his meeting with the defendant. He concealed a recording device and transmitter on the informant's person and gave him $1,500 in marked bills to purchase cocaine. The informant telephoned defendant twice to alert him that he was on his way to make the purchase. Under police surveillance, the informant was observed entering the designated apartment house (defendant's home address) where the "buy" was to be transacted. A man resembling defendant followed the informant into the building. Sgt. Buccino turned on his tape recorder as the receiver in the unmarked police car stationed a half block away began broadcasting. Officer Buccino testified that the tape of the "buy" transaction was not transcribed and that he auditioned the tape on several occasions, which tape, in his opinion, was only partly audible, the greater part being inaudible. The tape of the alleged September 5 "buy" was not offered at trial. Sgt. Buccino identified one of the voices being transmitted on September 5 as that of the informant and, having heard the defendant speak when he was arrested a few months later, identified another of the voices as that of defendant. Patently, Sgt. Buccino could not and did not testify to the contents of this taped conversation because such testimony would be hearsay. However, his testimony that the receiver in the police vehicle began broadcasting voices—the informant being electronically "bugged"—and his mere identification of those voices on subsequent playbacks of the tape of such broadcast, is not violative of the hearsay rule. Indeed, the officer testified that he identified the informant's voice on the transmission itself and that subsequent to the arrest of defendant, at which time he heard defendant speak and upon playback of the tape, he identified defendant's voice also. Not only did defense counsel not object to this testimony, but on cross-examination he pursued inquiry and elicited disclosure that "a great deal" of the tape of September 5 was inaudible. In light of the fact that Sgt. Buccino had overheard the original transmission *as it was being recorded* and that the tape, if otherwise available, could have been utilized for impeachment purposes, the acceptance by the trial court of this identification testimony must be sustained. Within 20 minutes the informant emerged from the building and turned over to the police a plastic bag containing a white powder which later proved to be more than one ounce of cocaine. On September 15, 1975, 10 days after the "buy" and in the presence of Sgt. Buccino and another officer, the informant again called the defendant, which conversation was recorded

with the informant's consent. The clearly audible tape of this conversation was admitted into evidence and was transcribed. Officer Buccino, who was present with the informant as he made the call, identified the other voice on the tape as that of defendant on the basis of his having personally heard defendant speak. Because of its critical relevance, the content of this conversation is set forth. ("ODI" is the defendant and "CI" is the abbreviation for confidential informant):

"ODI Hello

CI ODI?

ODI Hey, Hi, Murray.

CI What's doing? Hey, Odi, I'm in a lot of trouble.

ODI What's the matter, Babe?

CI That thing was garbage.

ODI What, are you kidding me?

CI Yeah, I'm serious. They got back to me and you know I don't know what the hell to do. They said 'Look we're looking for a quarter next or a half, and what'd you do to us?'

ODI Hey, you know I didn't see,—you know I brough it there. I showed it to you. The guy brough it. This is it,—and that was it. There was nothing else around. There's nothing else like that around.

CI Yeah.

ODI Nothing in town, as a matter of fact.

CI I can understand that. But, you know, they seen me, they says 'You know what'd you do?' This is just the way I got it.

ODI That's the way. You saw the way the man brought it.

CI Right. That's why—

ODI The way it comes—

CI—That's what I you know explained to them and everything and now they says 'Look, you know, what do we do now? You know we want a quarter or a half or something like that.' I said, 'Look, let me get to my guy —my man—I'll talk to him—

ODI Alright—

CI—and see what, you know.

ODI Let me get to these people—

CI Yeah—

ODI Somebody else. Because, I tell you that wasn't my regular guy. You know what I mean?

CI Right

ODI I told you.

CI Yeah. You had told me that.

ODI That isn't the regular man. You know—and that's what he had. I tell you, it was pretty good.

CI Yeah

ODI I didn't say it was like the other shit there, you know.

CI Right

ODI But that's all there was.

CI And you know the price was like fifteen, and—uh—You know I didn't even question it.

ODI Listen—I told you—this is not my guy—this is not my price—that's just what there is. And you said 'O.K. get it.'

CI Right.

ODI So I did.

CI Well, I figured, like you know, it would be as good as the other.

ODI I did too.

CI They got back to me and like he says 'What'd you do to me?' I expected something nice, and they couldn't even cut it, he says.

ODI What?—

CI They couldn't even cut it.

ODI That's bullshit.

CI They told me it was cut so many times, if they would've cut it, they could've got it in the street for like 800.

ODI Never listen—

CI Yeah?

ODI I'll tell you what. I'll get back to you tomorrow. I'll see if I can pick up on this guy tonite somewhere—

CI Alright

ODI And I'll get back to you tomorrow.

CI O.K.

ODI Alright, baby?

CI Yeah.

ODI Right.

CI O.K. so long."

Although there was testimony as to the terminology employed by the participants in this telephonic communication to the effect that it involved a narcotic purchase transaction for $1,500, even a novice could ascertain that the parties were referring to a past purchase of narcotics, the quality of which was suspect and that the defendant was the seller and the informant the buyer. This evidence is peculiarly critical because the People notified the court that the informant stated that he would not testify and that they received information as to alleged threats made to the informant's family. The informant was called by the People at the court's prompting to explore this matter. The Trial Justice, before exploring this issue, inquired of defense counsel whether he desired to move for a mistrial, which offer was rejected. In this connection it is observed that "It might be * * * that defense counsel, aware that a key witness [the informant], would not testify, was eager that the trial proceed, thinking that chances for an acquittal had improved, as undoubtedly they had" *(People v De Toré,* 34 NY2d 199, 208). Immediately upon taking the stand the informant declared that he refused to answer or testify. His attorney intervened and requested permission to make an *in camera* statement with respect to his client's refusal, to indicate that it was not contumacious. The court stated that the issue of threats to the informant was already injected and, accordingly, the informant's attorney pointed out that threats uttered by defendant were the major reason for informant's failure to testify and that the situation was unusual in that a confidential informant does not normally make the direct "buy" and the People in releasing the tape of the September 15 telephone conversation *prior to trial* to defendant, without informing the confidential informant, exposed the latter to danger. The informant's counsel admitted that his

statements were hearsay.* Both defense counsel and the People acknowledged that as this was a nonjury case, the Trial Justice would be mindful of potential prejudice to defendant. The court recognized the hearsay nature of the informant's counsel's statements and questioned the informant directly. The informant stated that he had not been threatened, and upon inquiry by the court whether he ever told the District Attorney that he would not testify due to threats to his family, responded, "I don't think I said that. I can't remember too well. My memory is not too good at the present moment." The Trial Justice at this point examined the informant *in camera,* without counsel being present, as to whether he or his family had been threatened. Upon resumption of trial, the court informed counsel that the informant denied being threatened. The informant's continued invocation of lack of memory prompted the court to declare him a hostile witness. Despite efforts to refresh the witness' recollection with a transcript of his Grand Jury testimony, the informant continued to plead lack of memory and even stated that his memory was not clear when he testified before the Grand Jury. The tape of the September 15 telephone conversation was played back in a further attempt to refresh the informant's recollection. He testified that he did not remember the call. After continued repetition of lack of memory, the informant was excused. Upon resumption of trial the next day, the informant was recalled and this time instead of pleading lack of memory, simply refused to testify. The Trial Justice excused the witness. Defendant's motion to dismiss for failure by the People to make out a case by legally sufficient evidence was denied and both the defendant and the People rested. The determination by defense counsel to rest was made after full appraisal of the People's argument as to the merits of their circumstantial case, which argument was sufficient to prompt the trial court's denial of defendant's motion. Defendant was found guilty of the first count, criminal sale of a controlled substance in the first degree. An affirmance under the evidence presented by this record is clearly warranted. The voice identification by Sgt. Buccino of the informant and the defendant in conversation on the fifth of September, based upon the original transmission being received from the electronic apparatus fixed to the informant's person at that time and upon the tape recording of that transmission viewed in the context of the surrounding circumstances of the "buy" transaction on that date, places the defendant in contact with the informant at the time of the sale. The informant prior to that transaction was searched by the police and found to be without narcotics. He was observed entering the premises, which is the defendant's home address, and within a relatively short time during which the above noted transmission was received, he returned with the narcotic (cocaine) which was introduced into evidence. The critical taped conversation of September 15 admitted into evidence, the parties to such conversation being identified as the defendant and the informant, contains a clear acknowledgment by defendant of a past sale of a narcotic in which transaction the defendant acted as seller and the informant as purchaser. Although the conversation does not specifically state the date of the sale, it does sufficiently set forth the amount paid for the narcotic substance, which is the same amount supplied by the police to the informant to effectuate the

---

* Informant's counsel's representation to the court that prior to trial he went to see defense counsel and informed the latter that the informant would not testify was corroborated by defense counsel. Defense counsel also stated to the court, with acquiescence by the informant's counsel, that he told the informant's counsel to instruct informant to tell the truth.

purchase. Further, this telephone conversation followed by only 10 days the sale transaction. Patently, the telephone conversation between defendant and the informant on September 15 is a subsequent act which confirms the sale of September 5. The voice identification by Sgt. Buccino was properly received in evidence. As noted by the Court of Appeals (Cardozo, J.) in *People v Dunbar Contr. Co.* (215 NY 416, 422–423): "A voice heard over the telephone may be compared with the voice of a speaker whom one meets for the first time thereafter as well as with the voice of a speaker whom one has known before. The difference affects the weight rather than the competency of the evidence *(People v. Strollo,* 191 N. Y. 42). Whether the identity of the speaker had been sufficiently authenticated was a question of fact to be disposed of preliminarily by the trial judge, and unless there was a total absence of evidence, this court is without power to reverse his ruling." Similarly, in our case, the identification of a voice in conversation heard on a live transmission in consequence of one of the participants in that conversation being "bugged" and of a voice heard on a taped telephone conversation, was competently received by the trial court. Remoteness of the personal oral communication between Sgt. Buccino and defendant from the time of any voice identification affects the weight only of the evidence (see *People v Dinan,* 15 AD2d 786, 787, affd 11 NY2d 350, mod on other grounds 11 NY2d 1057, cert den 371 US 877). The weight of the voice identification and the other evidence in this case was for the trial court as finder of fact. It is clear that the evidence established that the informant consented voluntarily to conceal the electronic transmitting device on his person before entering the premises where the "buy" was to take place, and that he voluntarily consented to the recording of his telephone call made to the defendant 10 days later. Without the testimony of the informant the People's case in this matter is based on circumstantial evidence. In reviewing such evidence it is well to heed the admonition of the Court of Appeals in *People v Becker* (215 NY 126, 136): "Extensive as is the power of review * * * on an appeal * * * the law does not intend to substitute the conclusions of fact which *may* be drawn from the evidence by seven judges for the conclusions of fact which *have* been drawn from the evidence by [the finder of fact], unless we are clear that the view of the facts taken by the [finder of fact] is wrong. It is our duty to affirm, if the trial was fair and without legal error and the verdict was not against the weight of evidence. We are to see to it that the trial was fair and that there was sufficient evidence, within recognized rules of law, to support the verdict; this done, the responsibility for the result rests with the [finder of fact]". Indeed, "The necessity of a resort to circumstantial evidence in criminal cases is apparent in the nature of things. For a criminal act is sought to be performed in secrecy, and an intending wrongdoer usually chooses his time and an occasion when most favorable to concealment, and sedulously schemes to render detection impossible. All that we should require of circumstantial evidence is that there should be positive proof of the facts from which the inference of guilt is to be drawn and that the inference is the only one which can reasonably be drawn from those facts" *(People v Harris,* 136 NY 423, 429). The detailed delineation of the circumstantial evidence set forth above is rendered to enhance appreciation of the probative force of such evidence as a whole. The majority opine that "Even giving as liberal an interpetation as possible to the identification and confirmation of a sale the People sought to establish through the conversation of September 15, 1975, and conceding that the two were discussing narcotics, there is *nothing* to indicate that the defendant sold narcotics to the informant on September 5, 1975" (emphasis supplied).

The commonsense experience of life and human nature possessed by those who don the judicial robe and preside over the judicial process whether at the trial or appellate level when focused upon the circumstances of the instant crime as narrated by the witnesses and supported by evidentiary matter, impels the conclusion that the judgment herein be affirmed. The tape of the September 15 telephone conversation is most clear and, under the dictate of common sense and reason, when such conversation is viewed in context with the other evidence including that of identification, the determination of guilt by the Trial Justice as finder of fact as well as law is patently supportable and should not be disturbed. Acknowledgment of the standard that guilt must be demonstrated beyond a reasonable doubt does not compel abandonment of the commonsense experience of life and human nature alluded to above. The trial was fair and without legal error and the Trial Justice's determination of guilt was not against the weight of the evidence. Missing from the September 15 telephone communication is the date of the prior sale transaction to which the participants were referring. *All else* in that telephone conversation viewed with common sense and reason refers to such transaction. I reiterate, reason and common sense employed under the guidance of established legal principles governing appellate review, clearly warrant concluding that the judgment of the Supreme Court, Bronx County, rendered March 14, 1977, after a trial without a jury, convicting defendant of criminal sale of a controlled substance in the first degree, should be affirmed.