# Court of Appeals.

February 26, 1895.

## PEOPLE v. ROBERT W. BUCHANAN.

(64 St. Rep. 427; 145 N. Y. 1.)

1. WITNESS—RE-EXAMINATION.

    A witness may be examined by the party calling him upon all topics on which he has been cross-examined, for the purpose of explaining any new facts which came out, even though the cross-examination has been as to facts not admissible in evidence; but the re-examination must be confined to the subject-matter of the cross-examination.

2. EVIDENCE—HOMICIDE.

    Upon the trial of an indictment for murder in killing his wife, evidence is relevant to show that the formed intention of defendant to be possessed of the estate of his deceased wife was accomplished by securing the fruits of his crime.

3. WITNESS —§829.

    The protection extended by the statute to comunications between attorney and client will not cover the revelations of confidences made to a friend, or to a lawyer in the presence of a friend.

**4. SAME—CROSS-EXAMINATION.**

Where, on the cross-examination of a witness for the prosecution, statements made by him to reporters of his suspicions as to the defendant's guilt were brought out, it is proper to show, on re-direct examination, the reasons of the witness for such statements, and the source of his information on which they were based.

**5. EVIDENCE—HOMICIDE.**

Where it appears that a physician called to attend the deceased gave her a prescription to be taken in doses of one teaspoonful, and that an hour later the defendant gave her two teaspoonfuls of some liquid, the taste of which was bitter, it is competent, upon the theory of the prosecution that morphine was then given, to permit an experienced apothecary to show how the morphine could be combined with the prescription of the physician, that the taste would be bitter, and that it was necessary for the defendant to give two teaspoonfuls in order to dispose of that quanity of the drug.

**6. SAME—DECLARATIONS.**

Upon such trial, declarations by the defendant during his married life, which reflected upon his wife, exhibited his feelings toward her or showed a desire to be rid of her, are admissible.

**7. TRIAL—MOTION TO STRIKE OUT.**

Where the first count charges the act to have been committed by giving " a deadly poison called morphine," while the second count charges its commission by giving " a certain deadly poison to the grand jury unknown," and the district attorney, in response to a request by the defendant elects to go to the jury upon the second count of the indictment, a motion to strike out all the testimony on the subject of morphine, is properly denied.

**8. SAME—VERDICT.**

Where, after the jury had agreed upon their verdict, one of their number became suddenly ill, but, having improved, was brought in later in the day and took his seat with his associates, and, upon the advice of the court, the jury again retired and conferred, the verdict returned by them is properly received.

**9. NEW TRIAL—SEPARATION OF JURY.**

The denial of a motion for a new trial, made upon the ground that there had been an illegal separation of the jury, is in the discretion of the court, where the proofs raise a question of fact.

**10. SAME—INCOMPETENCY OF JUROR.**

A motion for a new trial on the ground that a juror became mentally incompetent on the trial before the rendition of the verdict, is properly denied where, upon the conflicting opinions of the experts, the facts stated in the affidavits and those within the observation of the court, it cannot be said that the moving party made out a case of mental incompetency in the juror.

Appeal from judgment of the court of general sessions of the peace in and for the city and county of New York, entered upon a verdict convicting defendant of the crime of murder in the first degree.

Charles W. Brooke, W. J. O'Sullivan and Herbert W. Knight, for appellant.

De Lancey Nicoll and John R. Fellows, for respondent.

GRAY, J.—The defendant was indicted by a grand jury of the city and county of New York for the crime of murder in the first degree, in killing Anna Buchanan, his wife, with poison administered to her on the 22d day of April, 1892. The indictment charged the commission of the crime in two counts; the first of which stated that the defendant had administered to the deceased "five grains weight of a certain deadly poison called morphine," and the second of which stated that he had administered to her "a certain deadly poison to the grand jury unknown," etc. Being tried upon the indictment, the defendant was found guilty, by the verdict of a jury, of murder in the first degree. From the judgment entered upon that verdict the defendant has appealed to this court and it is our duty, under the statute, to review the facts, in order that we may become satisfied that the verdict was neither against the weight of evidence, nor against law and that justice does not require a new trial of the issue. In the language of the statute, we are to "give judgment without regard to technical errors, or defects, or to exceptions which do not affect the substantial rights of the parties." The responsibility and labor thus devolved upon the court are very great. It devolves upon us to pronounce upon the sufficiency of the proofs and the substantial correctness of all the proceedings upon the trial, which preceded the rendition of the judgment of death. This responsibility is only sensibly lessened, when we can see that the verdict of the jury was based upon sufficient evidence and that the defendant had a fair and impartial hearing.

The examination of this very large record has been carefully made and a patient and conscientious consideration given to the facts elicited upon the trial and to the points made by the skill-

ful counsel for the defendant, in his effort to procure a new trial. It is our judgment that nothing appears upon the record, which would justify us in reversing the conviction. The evidence upon which the defendant was found guilty is wholly circumstantial in its nature; but all the circumstances were pregnant with his guilt and combined to denounce him as the sole author of a crime by which his wife was deprived of her life. The evidence was abundant and satisfactory to establish the fact of her death having been caused by poison and not to have been the result of some natural disease. The endeavor to demonstrate the contrary was by no means convincing. While the proof of a death from unnatural causes must rest upon the investigations and the opinions of experts and confusion may often result from the irreconcilable character of their testimony, it is not so difficult in this case for us to disregard that given by the medical experts for the defense. The detection and punishment of a crime committed secretly and with precautions against a knowledge of it becoming possible thereafter, of necessity, justify, if not compel, the submission to the jury of every fact and circumstance, which may reasonably bear upon the act, or the motive for it. The justification, of course, does not exist, if neither connection, nor illustration, can be seen in the facts offered to be proved. In People v. Harris, 136 N. Y. 423; 49 St. Rep. 751, we had occasion to consider the reasons which make the acceptance of a verdict, based on circumstantial evidence, satisfactory and the discussion need not be resumed here. In the present case, the judicial investigation is aided in a surer degree, than in the Harris case. In both cases the husband was ·charged with killing his wife with poison; but in the former the marriage relation was secret and the opportunity of the defendant less evident, while here the intimate marital life existed and there was the conspicuous fact in the case that the defendant was seen to administer to his wife at her bedside something, which the circumstances satisfied the jury, and which satisfy us, could not have been the medicine prescribed for her by the physician, but which was some part of the poison which caused her death.

In order to demonstrate that which is the primary fact to be established; namely, that the deceased came to her death by

poisoning, it will be of use to detail certain general and known facts. In April, 1892, the deceased was living with her husband, a practicing physician, at 267 West 11th stret, in the city of New York, and was of the age of forty-nine or fifty years. Her habits were and had been temperate and her health was testified to, by those who had known her, as having been good for the previous fourteen years. On Friday morning, April 21, 1892, after eating a hearty breakfast, she was taken ill; feeling severe pains in her head and unable to stand up. She was placed upon a bed and Dr. McIntyre, a physician, was called in at about eight o'clock; who found her complaining of excruciating pains in the head and of a tightness about the throat, which made it difficult to breathe. She was nervous and apprehensive. Her temperature was normal, but her pulse was accelerated. His examination led him to believe the case to be one of hysteria and he prescribed, as a nervine, a small dose of bromide mixed with ginger syrup and water, to be given in doses of one teaspoonful every two hours. At two o'clock of the afternoon he called again and, finding the symptoms aggravated, changed the prescription, by adding two drachms of chloral hydrate to the bromide; the doses to be the same as before. An hour later, at about three o'clock, the defendant was seen to give his wife a dose of two teaspoonfuls of medicine. After taking it she reached for an orange and bit into it, or sucked from it, as though there was a bitterness of taste. She spoke rationally; but in ten or fifteen minutes she fell into a deep sleep. At seven o'clock she was found by Dr. McIntyre and another physician in a state of profound coma; with the breathing stertorious, the respiration slow, the pulse very rapid, the face flushed, the skin hot and dry and the eyeball irresponsive to the finger touch. They treated her for possible idiosyncrasy to chloral; without restoring her to consciousness. Later in the evening the physicians returned and found the same condition. They concluded the deceased was sufferig from cerebral apoplexy; a conclusion reached by the exclusion of either uraemia, embolism, or narcotism from chloral; in part, because of statements by the defendant and, in part, as the result of diagnosis. The next morning she was found in the same condition of coma, with a high temperature, a flushed countenance, a

warm skin and with the pupils of the eye normal, save a slight dilation in the right one. The case was treated as one of cerebral apoplexy. She died in the afternoon and was buried on Tuesday. Her body was exhumed forty-two days later, at the instance of the district attorney, and subjected to a medical examination was then had at the hands of experienced chemists, served. The autopsy was performed by two skilled pathologists and revealed no cause for death in any lesion of the brain, or in any disease of the spinal cord, or of the various organs of the body. The examination of all the organs and of other matters taken from the body was made in gross and microscopically and no evidence was found of cerebral hemhorrage, or of any disease having existed which would account for the death. An examniation was then had at the hands of experienced chemists, who subjected to an analysis the intestines and their contents, the stomach and its contents, and the liver, being those portions of the body more easily revealing the presence of poisons. They applied as tests six re-agents, generally approved and accepted by chemists, as methods for determining the presence of morphine poison, and, in addition, a physiological test. The result of all the tests taken together was to establish the presence of morphine to the extent of one-tenth of one grain. The physiological test was performed by injecting a portion of the residues of the viscera in a frog and by injecting fractions of a grain of morphine in other frogs of the same size, to get the comparative effect of the several injections. It was their opinion that a discovery of that amount of morphine indicated, under all the conditions, a dose of from four to five grains of morphine. The chemists also found a substance which was consistent with atropine, which is a preparation of the belladona plant. It answered the chemical and physiological tests of atropine, except in one instance, and the failure there was consistent with the presence of atropine; inasmuch as that drug upon the application of the same re-agent did not reveal itself. Two physicians were then examined and in answer to a hypothetical question, which fully and fairly resumed the facts connected with the illness and death of the deceased and the subsequent pathological and chemical examniations of her body, they gave it as their

opinion that she had died from narcotic poisoning; the narcotics being morphine and atropine, or some other preparation of belladonna. In their opinion the symptoms of the morning of Friday pointed to atropine poisoning and from the afternoon on to a combined action of that drug and morphine. One witness stated: "The picture is of a modification of morphine symptoms, such as is known to be produced by atropine." It appears from the evidence that the usual symptoms of morphine are modified by atropine and that there results a slowness of respiration, a dryness of the skin and the flushing of the face, the two latter of which are characteristic of atropine poisoning; while the coma was characteristic of the two poisons combined. In the opinion of these witnesses a dose of at least three grains of morphine must have been given. I should add that the embalming fluid injected into the body was found to contain neither morphine nor atropine.

As against the evidence produced by the People to prove death by poisoning, the defendant called a pathologist, who disagreed with the diagnosis as to the condition of the deceased on the Friday morning, and gave it as his opinion that she was suffering from hysteria and, in answer to the hypothetical question, said that she died from uraemic coma, or coma resulting from cirrhotic changes of the liver. He admitted that death could not have been from cerebral hemorrhage; but he thought that the People's witnesses had mistaken a substance called ptomaine, which is a poisonous product of putrification, for morphine. Two chemists were also called as witnesses. One of these testified to the existence in bodies, after the lapse of some time, of these chemical products called ptomaines He did not believe that the People's chemists could have tested with any certainty for morphine, or atropine, with the impure residues of the viscera and that they must have mistaken the characteristic re-actions. The other witness criticised the method of the People's chemists as useless and testified to the existence of a ptomo-atropine; which is a ptomaine showing the same re-action that atropine does. To meet these criticisms the People's chemists were re-called and gave further evidence in reply. One of them performed before the jury similar experimental tests to those applied to the residues from the viscera of the

body and, apparently, with the result of sustaining his previous testimony as to the characteristic or color re-action obtained. The issue between the expert witnesses for the prosecution and those for the defense, which the jury were to pass upon, was not, in my judgment, very difficult to decide.   On the one hand they had the evidence given by two pathologists, who had actually examined the body with the most scrupulous and minute attention, that the condition of the body was one of remarkable preservation and revealed no cause for death in any disease of any of the organs, of the spinal cord, or of the brain.   They had the evidence given by two chemists, skilled in toxicology, who had applied all the known and excepted tests for the discovery of the presence of poisons, that they had isolated one-tenth of a grain of morphine and had found a substance consistent with atropine and acting as atropine would under like conditions. Finally, they had the evidence given by two medical practitioners, who, upon the conditions disclosed by the evidence, in connection with the illness and death of the deceased and with the subsequent expert investigations conducted upon her remains, stated that the sensations and death of the deceased were consistent with and pointed clearly to a poisoning by atropine and morphine.   The evidence of the pathologists was explicit that death was not and could not have been, under the conditions disclosed, caused by uraemic, or cirrhotic, coma and the jury were well warranted in relying upon the evidence of witnesses; all of whom were skilled and eminent in their profession.   There was not enough doubt cast upon it in the evidence of the witnesses for the defense, for the pathologist had not seen the body and the two chemists had not examined the contents.   If they criticised the tests or methods of the People's witnesses and disbelieved their statements as to results obtained, their evidence did not, necessarily, subvert, nor shake, the People's proof; in part because of the theoretical basis of their opinions and in part because the subsequent examination of the People's witnesses established, or tended to establish, the reliability of their previous statements as to chemical results.

It was sought to introduce an element of doubt into the case made by the People by evidence as to the existence of ptomaines

in bodies in course of putrefaction. The discovery of these poisonous products of decaying, or dead, animal matter is recent and they are said to resemble the vegetable alkaloids. We may concede, as not unlikely, in the absence of suspicious symptoms preceding and attending the death of a person and where the chemical tests have been inexact or incomplete, that the charge of a death being caused by poison would be insufficiently borne out by the discovery of a substance, which, while responding to several of the tests of morphine, or of atropine, would be equally consistent with the existence of ptomaines. In such a case the person charged with the crime might be entitled to the benefit of the doubt. But the facts were quite other here. We have the physician's symptoms preceding death and the uniform results of approved and exhaustive chemical analysis. Professors Doremus and Witthaus, the People's chemical experts, testified to their familiarity with these ptomaines from study and observation and that they could not have been mistaken in their conclusions as to the presence of pure morphine and of a substance resembling atropine. Professor Vaughn, the chemical expert for the defense, had testified that the color test for morphine would not be reliable in the presence of the impurities of the residues from the body; that the characteristic re-action of pure morphine can be obtained only when it is in a pure state. He spoke of one well-known ptomaine, called indol, as giving the six re-actions of morphine in such a manner as not to be distinguished from morphine in impure solutions. Professor Witthaus, being recalled, applied the same test in his investigations to the ptomaine, called indol, and to morphine and, showing the contrasts between the re-actions of the two substances, testified again positively that the color obtained from the pure morphine was similar to that ultimately obtained in the tests applied to the residues from the body of the deceased. A circumstance may be alluded to as conformatory of the statements of the expert witnesses for the prosecution, as to the discovery of morphine in the body. It appeared by the testimony of several witnesses upon the trial that the defendant had said to them that morphine would be found in his wife's body. That statement was made when the exhuming of the body was in question and when he apparently sought to anticipate the find-

ing of morphine by saying that his wife was a morphine eater. The examination and cross-examination of the experts were protracted and a generous latitude was afforded to the defendant's counsel by the learned recorder; who did not err on the side of severity. The extended examinations of these witnesses probably had the merit of enabling the jurors to judge of the competency of the experts and of the accuracy of their evidence and to weigh the probabilities of the case; though, probably, more or less incapable of appreciating the details of the exhibition of scientific knowledge and tests, which was being given for their benefit and instruction. .

Even if we had a doubt as to the cause of the death, we would not be justified in reversing the verdict of the jury, for there was an abundance and a preponderance of evidence to support their finding. Through the evidence describing the symptoms, the distinction between them and those of a disease suddenly developed became possible. If it is plain, then the verdict of the jury should not be disturbed, which pronounces in accordance with it and which is supported by the evidence of the autopsy and of the chemical analysis. The discussion upon this branch of the issue has been somewhat prolonged; but it is justified by its gravity and the necessity of assuring ourselves that its determination adversely to the defendant was not arrived at without evidence which was clear and convincing. It was in the sole province of the jury to decide, upon the evidence, what was the cause of the death of the defendant's wife and, in my opinion, their decision is not only supported, but could not conscientiously have been made otherwise.

The next question, then, which was to be determined by the jury, was whether the defendant was guilty of the charge of having administered the poison to his wife, which caused her death. This is an indispensable fact, which depended for its proof here upon evidence of a circumstantial nature. The consideration of the question calls for a somewhat extended review of the facts disclosed by the evidence.

The defendant was born in Nova Scotia, in 1862, and came to New York in 1886, with his wife and a young daughter, to practice the profession of medicine. In the summer of 1890, he obtained a divorce from his wife. Later in the same year, he be-

came acquainted with a woman in Newark, New Jersey, by the name of Anna B. Sutherland, whom he claims to have treated professionally. She was then some twenty years his senior in age and was engaged in keeping a house of prostitution, or of assignation. According to his statements, she became infatuated with him and on November 26th, 1890, made a will, by the terms of which she gave all of her real estate to her husband (if any), at the time of her death and, in the event of her death unmarried, after small legacies to a sister and brother, she gave the whole residuary estate to her physician, the defendant. Three days later, she was married to the defendant. Twelve days after the marriage, she conveyed her Newark house and lot by deed to the defendant, in consideration of one dollar. They resided after the marriage in West 11th street, New York city. The fact of the marriage he endeavored to conceal, and for a long time denied it to friends and companions. He represented that she was his house-keeper and that she was importuning him to marry her; but that it would ruin him to marry a woman of her reputation. Dissentions arose between them and they became dissatisfied and wearied with each other. She resented his neglect and dissipated conduct. Towards the end of 1891, she wanted her property back and seems to have threatened to return to Newark to resume her former occupation. During the winter of 1891 and 1892, and in the following spring months, according to the testimony of several of his friends, the defendant expressed himself as unable to endure her; variously stating that she was unbearable; that she was "hounding him to marry her or to deed the property back;" that he did not want her to go back and keep a house of prostitution, because of the injury it would do him; that he would "dump the old woman," of the "old hag;" that he had made up his mind to get rid of her, "no matter what it cost;" that he would let the New York house and, if necessary, leave the country. In February he commented, in the presence of several persons, upon Carlyle Harris not understanding his business and upon his leaving a trace behind; (Harris then having been tried and convicted for the poisoning of his wife). He made preparation for breaking up housekeeping, by leasing the New York house. About, and previously to, this time, the witness Macomber, with whom he ap-

pears to have been on most intimate terms of friendship, tes-
tified that the defendant said to him his wife had kidney trouble
and would not live long; that she had threatened to poison her-
self and that he had told her to "help herself," as she knew
where he kept the poisons. Though she was not taken ill until
Friday morning, April 22d, and having been previously per-
fectly well, on Thursday he told Macomber that his wife was
sick; that he thought Bright's disease was developing and she
would not get over the attack. At this time the defendant was
in the habit of taking all his meals at Macomber's restaurant.
The deceased was suddenly taken with illness after breakfast.
Her previous good health was testified to by a witness, who
had known her intimately for years, and he, and others who saw
her just before her attack, testified to her healthful appearance.
Though Dr. McIntyre, who was called in at eight o'clock on
Friday, diagnosed her case as one merely of hysteria, the de-
fendant told Macomber at breakfast, and again at noon, that
she was worse and would not live twenty-four hours. Other
witnesses testified that during the afternoon of Friday he had
spoken of his wife, to the effect that she was about to die. In
the evening of Friday, he exhibited articles of jewelry and
manufactured a story that his wife had given them to him be-
fore witnesses, summoned in by him. On Saturday morning he
told Macomber "the old lady" would not live the day out and
in the afternoon, when she died, he took a walk with him and
remarked that "it looks as though Providence was smiling upon
him;" that "she was going to quietly step out and he would
avoid all trouble." Turning to the scene of the sick room, we
find Dr. McIntyre returning at two o'clock to find the symptoms
worse. The defendant told him he had given her the medicine
regularly. He changed his prescription by the addition of
chloral hydrate to the bromide and, having prescribed the same
dose of one teaspoonful every two hours, left. A little after
three o'clock Mrs. Brockway, bringing with her, at the defend-
ant's request, a nurse, entering the sick room, saw the defendant
give his wife two teaspoonfuls from a phial containing a liquid.
Though the nurse could not state positively that she saw two
teaspoonfuls given, it was the fact, afterwards corroborated
out of the defendant's own mouth; who sought to explain it

on the ground that all the teaspoons were packed up, previous to departure, and that the only teaspoon available was a small one of his child's. It was subsequently proved, by the evidence of Mrs. Brockway and the nurse, that the teaspoon was of the usual size, and by the latter and a man who worked in the house, that there were other teaspoons about. Immediately after taking the medicine, the deceased was seen to make a wry face and to take up an orange and to bite, or suck it. In giving the second teaspoonful, the defendant's hand shook, so as to spill some of its contents upon his wife's neck. At the time of Mrs. Brockway's visit, the deceased was able to talk rationally and to remark how well she had felt in the morning, before her sudden seizure. In ten or fifteen minutes she fell into a profound slumber, from which she never awaked. The defendant left the room hurriedly, after giving the dose to his wife and upon the entrance of Mrs. Brockway and the nurse, alleging important business. He returned in an hour, felt her pulse and again went out. While in the house that time a man whom he had some time previously engaged to cart his effects over to Newark, called to inquire after the job, and was told by the defendant that his wife was sick; that he did not believe she would get well, and his services would not be needed. In the evening when Doctors McIntyre and Watson, finding a continued state of coma, thought she might be idiosyncratic to chloral, the defendant volunteered the explanation that such was not the fact; for the reason that his wife had been under Dr. Janeway's care, and that she had had three or four doses of eight grains of chloral each day. It was subsequently proved by the testimony of the only two doctors of the name of Janeway, that they had never treated, or prescribed for, any woman of her name. Again, upon the same occasion referred to, when, because of his statement, the physicians excluded narcotism from chloral and upon examination other causes and concluded in favor of cerebral hemorrhage, the defendant volunteered the further statement that the father of his wife had died of apoplexy. It was subsequently shown that he died of gangrene of the foot. The next day, Saturday, about four o'clock, the death occurred. Before the occurrence the defendant went out, and did not return till the evening after the death. He then said to the nurse that he was going to Philadelphia in a late train to see his wife's brother. It was during that afternoon's absence that the walk

and the conversation with his intimate, Macomber, took place, in which he had expressed himself about the smiles of Providence. In the evening of the Saturday, when he returned to Macomber's, he told him "the old lady" was dead and he was going to a hotel for the night, rather than stay in the house with a corpse. On Sunday morning, about nine o'clock, he went to his house and gave the nurse to understand he had returned from Philadelphia and that his wife's brother was a very sick man. Upon the return from the funeral the defendant, placing his daughter in one carriage, returned with three of his friends in another. He expressed to them his great relief at the death and stopped to drink in several saloons. A woman residing in a house at which he called, upon the return from the funeral, testified that he said to her that he had just buried his sister. She remarked to him that he "was feeling pretty jolly over it," and he replied, "those things cannot be helped; we all have to die." She saw him then try to embrace a woman, who was residing in the house. He made various statements to his friends, respecting his acquisition of property through his wife's will, and conducted himself in a dissipated manner. After some days he went to Nova Scotia, where, within three weeks of his wife's death, he re-married his first wife and returned with her to New York. He went to see his friend, Macomber, and spoke of the charges which had appeared in the "World" newspaper, that he had poisoned his dead wife and had re-married his first wife. To him and to others he denied the re-marriage. In an interview with a reporter for the "World" he characterized the report of his re-marriage as absurd; denied that his deceased wife kept an assignation house, and concocted a story as to how he had met her; gave her age as thirty-six; said she died of cerebral hemorrhage and denied she was a morphine eater. Becoming alarmed by the newspaper charges, he spoke to two or three persons about going away till "the thing blew over." He manifested the utmost uneasiness about the investigation and the exhuming of the body. He made preparations to leave the city under an assumed name and arranged with Macomber for information through a telegraphic code, in the event of the grave being opened. Upon one occasion he went with friends

to the cemetery, to see if the grave had been opened, and mistaking his way, and coming upon one that was, he showed great alarm.   He sought a residence for himself, his wife and daughter, under assumed names, in the upper part of the city.   When it was suggested that he had nothing to fear from an investigation, he said that his deceased wife was a morphine eater, and that morphine would be found in her body and, coming so soon after the Carlyle Harris case, that he would be tried for his life. He even told a story of how he had caught his wife eating morphine.      To his friend and companion, Macomber, upon an occasion, he admitted that his wife died of an overdose of morphine and that she was in the habit of taking belladona for her bowels, which would obviate the usual effects of morphine. His explanation was, when asked why he did not tell that to the physicians, that they would report the case and there would be an-inquest.   He consulted lawyers about extradition treaties. To some friends he expressed the wish that he had cremated his wife's body.   It is clear from the evidence given by the great array of witnesses, called to testify concerning the defendant's acts and declarations at various times, that he was in an apprehensive condition of mind and manifested the utmost dread of an investigation.

Very much more could be narrated from the record to exhibit the conditions of his mind, which, before his wife's death, showed that he dwelt upon such an event and anticipated its occurrence, and, upon the happening of the event, showed, first, a great satisfaction, in committing various excesses and in immediately re-marrying his divorced wife, and, subsequently, when the rumors arose about the sudden death, showed restlessness and fear, all being conditions quite incompatible with innocence.   It is true that the defendant was examined in his own behalf and denied the commission of the act charged and more or less of the statements testified to as having been made by him.   But he involved himself in a maze of statements, of such untruthful and incredible nature, as to justify the jury in discrediting him generally and especially when in conflict with those of persons, who, with the possible and not very important exception of the witness, Smith, had no apparent personal motive to procure his conviction.   He admitted the untruthful-

ness of his statement that he went on the night of the death to Philadelphia, to see a sick brother of his wife, or that she had a sick brother there, and justified it by the plea of a motive to conceal the facts about his wife's relations. He said he went that night to a certain hotel in Newark, but could not remember whether he registered under his own, or a false name. Upon the production of the hotel register, he was unable to identify any signature as his own. His denial that he knew, previously to his marriage, that his wife had kept a house of assignation, though immaterial, is incredible and is in contradiction of what several of his friends testified to. He said he had treated her for Bright's disease before marriage and that afterwards she was several times treated by Dr. Janeway, in New York, for kidney trouble. Both of the medical practitioners of that name in the city denied knowledge, or the treatment, of any such woman; whether under her former name of Sutherland, or that of Buchanan. He had spoken of her going to Bellevue Hospital, to find Dr. Janeway, and of her going to a dispensary patient against his wishes, but the records of that hospital showed that no prescription had ever been put up for Dr. Janeway and that no patient of her name was on the books. He contradicted Dr. McIntyre's testimony as to the statement made by him, that his wife was accustomed to chloral. He also contradicted the testimony of one of his friends, with whom he was forced to admit he continued to be on good terms, that he had spoken to him in prison of his wife's being a morphine eater and of that being the cause of her death. He endeavored to explain why he was giving his wife two teaspoonfuls of the mixture from the phial, on the Friday afternoon when seen by the two women who entered the room, and said it was a child's small teaspoon and required being twice filled for the dose. He said all other spoons had been packed up. In these statements, as I have mentioned, he was contradicted by the nurse, by Mrs. Brockway and by the man who worked for him about the house. The testimony of the defendant, read in the light of all the evidence and of its own inconsistencies, induces the conviction that he was untruthful in most of its material statements. In one instance, the evidence that he had stated that his wife was a morphine eater and that morphine would be found in her body when exhumed, was corroborated

by the testimony of Knight, a lawyer whom he was taken by Macomber to consult, in Newark. His denial of the commission of the act charged is to be given its full weight, in view of the gravity of the offense and the penalty inflicted by the law; but the weight of the evidence and its whole effect are to not only confirm the conclusions reached by the jury, but, in my opinion to make any other impossible. If we regard the chain of events from the time when,. after the will made in favor of a husband, the defendant made the ill-assorted and degrading union with the deceased, along through their unhappy married life in New York, to her sudden seizure, in full health, with symptoms singularly consistent with narcotic poisoning; with his inexplicable conduct during the seizure and continued after the death, first in debauchery, then in the re-marriage with his divorced wife, within three weeks, then in the exhibition of an apprehension of an investigation, followed by preparations for flight and a concealment under an assumed name—in all the facts of the case, we find a chain forged, which prevents the accused from evading the judgment pronounced upon him by the trial court.

Motives to commit the crime were not wanting; whether they lay in the desire to secure himself in the possession and enjoyment of the property of the deceased; or in the desire to avoid the degrading exposure of his marriage with a woman of such a reputation. In the former case, the will gave the estate to the husband; but it was revocable and revocation was not improbable after the dissensions between them. In the latter case, she threatened to go back to her house in Newark and to resume her former occupation. It is immaterial which was the actual motive. The existence of either suffices and every thing that could throw such light upon his acts as to reveal a motive was admissible.

In the presence of the grave consequences of the verdict, I have sought to find the evidence of acts consistent with a probability of innocence; or some weakness in the chain of circumstances, which would warrant us in saying that some were at variance with the probabilities of guilt. I am not able to find either and I must advise an affirmance of the judgment, unless the learned recorder, who presided at this trial, committed

some error thereat in his rulings, which, because prejudicial to the defendant, necessitates, in the interest of justice, the ordering of a new trial.

His charge was clear, full and satisfactory upon the facts and the law, so much so that the counsel for the defendant noted no exceptions to it. The exceptions taken to the rulings of the recorder upon evidence have all been carefully considered in the review of the case. A few of them, of sufficient importance to be passed upon, will be referred to.

The witness Smith, who had been an intimate associate and a partner of the deceased woman before her marriage with the defendant, was examined to show her excellent condition of health. Upon cross-examination it was sought to show that he had aided in the mater of the prosecution of the defendant from revengeful motives. He was asked if, after the woman's death, he had communicated with the coroner and, upon his saying that he had, was asked if he gave him "some information about a will to Dr. Buchanan." He said he did not know there was a will in existence, at that time. He was then further asked if he had suggested to the coroner "anything about his inquiring about poison," to which he answered, no. Upon his re-direct examination by the district attorney, he was asked to state what he did say to the coroner; and he was allowed, over the objection of the defendant, to give the conversation. The ruling was not error. The object of the defense was to discredit the witness, by showing the existence of malign motives to revenge himself on the man who had supplanted him. If the defendant chose to open an inquiry as to a conversation between the witness and the coroner, it was proper enough and just that the jury should be placed in possession of what the conversation actually was. I understand the rule to be that a witness may be re-examined by the party calling him upon all topics on which he has been cross-examined, for the purpose of explaining any new facts which came out; but the re-examination must be confined to the subject-matter of the cross-examination. He may be questioned to show the meaning of his expressions, or of his motive in using them. 1 Starkie on Evid. *208; Clark v. Vorce, 15 Wend. 193, 196. Even if the cross-examination has been as to facts not admissible in evidence, the rule seems to be that the witness may

be re-examined as to evidence so given. 1 Greenl. on Evid. § 468; 2 Phillips on Evid. 973; Blewett v. Tregonning, 3 Ad. & El. 554. In this case the additional reason exists that the request for the actual conversation, as to which the witness had been cross-interrogated, was proper, in order to rebut the inference suggested concerning the motives of the witness. The re-examination of a witness is, largely, in the discretion of the court. The proper limitations upon it are that it shall relate to the subject-matter of the cross-examination and bear upon the question at issue. He cannot be asked as to new matter. Powell on Evid. 529. The reasoning, with respect to the right of the prosecution to re-examine a witness as to matters opened up upon his cross-examination, is applicable to other exceptions. In the case of the witness, Macomber, the cross-examination has been directed, largely, to destroying the effect of his testimony and to impairing his value as a witness, by showing him to be unworthy in character for betraying his friend, and statements made to reporters of his suspicions as to defendant's guilt were brought out. The cross-examination had taken a very wide range of subjects. The prosecution was justified in negativing the imputations, or inferences, the defendant might claim to be deducible from the facts elicited. It was competent to elicit an explanation of the reasons of the witnes and the source of the information on which his statements were based. Having entered upon that line of examination, the defense may not complain of its being pursued by the People, in order that the jury might be able to judge for themselves as to the character and motives of the witness. It all bore in some degree upon his character for credibility. So, when the defense brought out portions of a conversation between the witness and a man named Doria, in which the latter told of the defendant's having seduced his (Doria's) wife before their marriage, the People were at liberty to call for the whole conversation. It seems that Doria's suspicions had become aroused about the defendant from what he had heard him threaten and he communicated them to Macomber. The defendant tried to show Doria was actuated by revenge, but they opened the door for the whole conversation.

Objection was taken to the introduction in evidence of the will

of the deceased, made three days before her marriage with the defendant. It was, however, a piece of material evidence, competent and relevant upon the question of motive. Before marriage he was only a possible legatee; but upon marriage he would become the certain legatee, if she were to die without any change made in the will. In like manner, the deed of the Newark property, made to the defendant a few days after marriage, and the deed to Knight, made by the defendant in September, 1892, after his indictment for the crime, were competent upon the question of motive. The will showed the existence of an inducement to marriage. The deed, made a few days after marriage, showed the defendant's desire to obtain the property. The deed after death tended to show the realization and consummation of the defendant's scheme. The evidence was relevant to show that the formed intention to be possessed of the estate of his deceased wife was accomplished by securing the fruits of his crime. It is, moreover, difficult to see how the introduction of the deed could possibly prejudice him.

Exception was taken to the rulings of the trial judge, which permitted Macomber to testify to conversations had between the defendant and Knight, a lawyer in Newark, and Davison, a lawyer in New York. Communications between counsel and client are, as between themselves, protected from disclosure; but if heard by another, in whose presence they are made, the confidential character is gone. Jackson ex dem. Haverly v. French, 3 Wend. 337; Hoy v. Morris, 13 Gray, 519. The reason is obvious. A communication intended to be confidential should not be made in the hearing of a third person; unless the person stood in a peculiar relation of confidence; which was not the case with Macomber. He did not know of the crime and he simply took the defendant to see a lawyer, because his friend was alarmed by the newspaper comments and charges. The protection extended by the statute to communications between attorney and client is intended to cover those which the relator calls for and are supposed to be confided to the lawyer, to give him in giving his professional aid and advice. I am not aware of any extension of the rule, which would protect the revelation of confidences made to a friend, or to a lawyer in the presence of a friend.

The witness Ellison, an experienced apothecary, was permitted to make up the prescriptions given by Dr. McIntyre. He described its taste as being salty and then put four grains of morphine in a teaspoonful of the prescribed medicine and described it as bitter in taste. He showed that two grains of morphine were dissolved in one teaspoonful and the residue in a second teaspoonful. The evidence was relevant, in view of the testimony of Mrs. Brockway and the nurse, that they saw defendant giving his wife some liquid from a phial; that upon taking it she made a wry face and bit, or sucked from, an orange, and that in a few minutes she sank into a profound sleep, which ended in a state of coma. As the theory of the prosecution was that morphine was then given, it was competent to show, by one experienced in the art, how the morphine could be combined with the prescription of the physician; that there would be no change of color; that the taste would be bitter, and that it was necessary for the defendant to give two teaspoonfuls in order to dispose of that quantity of the drug.

The defendant insists upon the existence of error in many rulings of the recorder, under which Macomber and other witnesses were permitted to give in evidence declarations by him during his married life, which reflected upon his wife, or exhibited his feelings towards her, or showed a desire to be rid of her. It is argued that they had no bearing on the question of motive, and, as to some of them, that they were not made at the time of the alleged poisoning. The admissibility of such evidence was discussed in People v. Harris (supra). It was there said that "proof of the existence of the element of motive is aided, in some degree, by showing what were the defendant's relations and feelings towords his wife, as evidenced by his conduct and remarks when with others." I think all such evidence is clearly relevant upon the question of motive and tends to rebut that strong presumption from the marital relation, which militates in favor of the husband when accused of the murder of his wife. The evidence was, also, admissible, which bore upon the defendant's conduct at or about the time of death and afterwards. It showed his indifference to his wife and a gratification at being rid of her, which immediately displayed itself in ways of unbridled license and of singular disregard of decency.

The will, the precipitate and secret marriage with a woman of so unsavory a reputation and the deeding of the property soon afterwards, with the sudden death within eighteen months, were opening and closing scenes in a drama, which required to be filled in by proof, in order to understand the parts played by the defendant and his wife and to enable the jury to judge of his innocent or guilty participation in the denouement. Any declarations or admissions by him, which would tend to exhibit how he performed his part as a husband, or to indicate his sentiments towards her, were properly admitted. If they showed a purpose to obtain her property, inaugurated by the marriage, a repugnance or indifference to her afterwards, which created a desire to get rid of her; or the final promotion of a purpose, (if it had not always existed), to destroy her life, in order to secure his freedom and the enjoyment of her property; they were material and relevant to the issue of the defendant's guilt.

I think that no error was committed in ruling upon the sixty-three requests to charge, propounded to the recorder. After all the evidence was in and after the district attorney, in response to a request by the defendant, had elected to go to the jury upon the second count of the indictment, a motion was made to strike out all the testimony on the subject of morphine, which was the substance of the charge in the first count. The motion was properly denied. The first count had charged the act to have been committed by giving "a deadly poison called morphine;" while the second count charged its commission by giving "a certain deadly poison to the grand jury unknown." All the evidence, which would fit the charge in the first count, would be competent and relevant under the second count and tend to prove its charge. The chemical experts testified that they were employed to examine the corpse "for the purpose of detecting the presence of poisons, in any form of poison." They did discover the presence of morphine and of a substance acting as atropine would act, as the result of an analysis of the residues from the body and by certain characteristic re-actions from tests applied to them. The medical practitioners, upon the hypothetical question, gave it as their opinion from the symptoms that death was caused by the use of the two drugs morphine and

atropine. It is true that morphine poisoning was originally suspected as the cause of death; but, when the grand jury found the indictment, the chemists had not reported the result of their investigations into the cause of death, and the grand jury, obviously, could not charge with exactness. They, therefore, charged in separate counts the commission of the same act in different ways. It can hardly be said that it was charged in a different manner; for the substance of the charges was the administering of poison and the evidence to prove the particular charge would ge relevant to establish the general charge. The charge in the second count resumed that of the first. An indictment would not be affected because the proof established the commission of the crime by different means than what had been charged. That has long been the rule. In Hale's Pleas of the Crown, 2d vol. 185, it is said: "If A be indicted for poisoning B, it must allege the kind of poison; But if he poisoned B with another kind of poison, yet it maintains the indictment for the kind of death is the same." And see People v. Colt, 3 Hill, 432.

After the jury had retired, an incident occurred, which has been made much of and which constitutes the basis, in part, of a motion for a new trial. The jury retired in the afternoon of April 25th. In the evening of the day following, they were taken over to a hotel for their dinner. Paradise, one of their number, was taken suddenly ill and fainted. A physician was called in, who found him first unconscious and then delirious. He had him removed to another room, where he treated him professionally. A report of the occurrence was made to the recorder, who sent for and examined the attending physician, in the presence of the district attorney and of the defendant's counsel. He gave a description of what had taken place and of what he had done. He gave his opinion that the attack had been caused by the mental strain and he thought the juror might be able to come to the court after a while. Later in the evening, the juror, having improved, was brought over and took his seat, with his associates, in the jury box. It appeared that they had agreed upon a verdict before the illness, but the recorder thought it advisable, under the circumstances, to then receive their ver-
it inadvisable, under the circumstances, to then receive their ver-

and shortly returned with their verdict. · Upon the facts, as they were made to appear, there was nothing to warrant the trial judge in refusing to receive the verdict.

Subsequently, however, upon the hearing of the motion for a new trial, certain other facts were made to appear, which we have considered carefully, with a view of ascertaining whether they furnish any sufficient reason for believing that the verdict of the jury was not properly or fairly reached. One branch of the motion was based on the ground that there had been an illegal separation of the jurors. Affidavits were read, showing that upon the removal of the sick juror from the room, in which he and his fellow jurors were dining together, the other jurors separated; some running to and from the sick man's room and others going in other directions and alone. In opposition were read the affidavits of the jurors and the court officers; to the effect that the jurors were always in charge of the officers; that none of them were ever alone and that no communication was had with them by any person in reference to the case. Upon these proofs, it was discretionary with the trial court to order a new trial, or not, and with the exercise of its discretion we will not interfere. Code Crim. Proc. § 465, subd. 3. It was a question of fact and I think the judicial discretion of the learned recorder was well exercised, in having regarded the involuntary separation of the jurors as working no possible prejudice to the defendant. The second branch of the motion for a new trial was based on the ground that the attack, which the juror, Paradise, suffered from, was an expression of a generally deranged judgment and that his mind could not have been clear and sound, or capable of judgment, for some hours before and after. In support of that ground, the affidavits of several distinguished physicians and alienists were produced and read. It was their opinion, upon the statement of the physician, who attended the said juror, of the juror's son and of others, detailing what had occurred that the attack was epileptic in character. They, in substance, thought it evidenced a confirmed epileptic condition and indicated a mental disturbance, which must have existed for several hours and must have rendered his mental action unreliable and valueless. In opposition to these opinions, were read affidavits by several other physicians, expert in mental

diseases, who had made a personal examination of the juror and who gave it as their opinion that there was no perceptible indication of epilepsy, or of paresis, and that he was in full possession of his faculties. Upon Paradise's statement as to his past life, they were of the opinion that he had never suffered from epilepsy or insanity. They thought the sumptome of his attack were those of nervous exhaustion and of hysteria, induced by the close confinement and the long-continued strain upon him in the performance of his duties of a juror. His own affidavit was read, denying ever having suffered from epileptic attacks. He narrated the occurrences in the jury room and stated that after the first ballot, when he had voted "not guilty," he had upon each subsequent ballot voted "guilty" and that the jury had agreed upon their verdict before they went to the hotel for their meal. He stated that he felt well when he came back to court and was able to deliberate. He gave the facts about his past life and he showed that the day after the conclusion of the trial he had gone away on business and remained away till June, being in the full possession of his health and faculties. The affidavits of physicians, who had known and attended him in the past, stated that he had never manifested any epileptic symptoms, or any form of nervous disease. Other affidavits by his employer and by his fellow jurors, were read to show his mental competency.

The recorder, in denying a new trial, had before him the conflicting opinions of the experts, the facts stated in the affidavits and those within his own observation. It cannot be said that the defendant made out a case of mental incompetency in the juror. While the opinions of the physicians, secured by him, seemed to give support to his theory of a mental or nervous disease in the juror, which incapacitated him to deliberate or confer upon his case, they were not based upon any personal examination, but were premised upon the statements given them. In view of the evidence as to his physical and mental condition upon actual examination, as to the facts of his past life and of his condition for weeks after after the trial, the learned recorder could not well have decided otherwise than he did and I think we must agree with him that the opinions of the

experts for the People was warranted by the evidence and that those of the defendant's experts were not.

The elaborate opinion, which he delivered upon the denial of the motion for a new trial, contains a conscientious and able review of the question and is perfectly satisfactory.

I find no other questions demanding our consideration and, after the most patient consideration of the extended briefs of counsel and of this extraordinarily large record, covering a trial of over a month and the subsequent proceedings upon the motion for a new trial, my conclusion is that the defendant had a just and fair trial and that we should affirm the judgment of conviction appealed from.

All concur.

Judgment affirmed.