### UNITED STATES v. PLEVA et al.
#### No. 454.

Circuit Court of Appeals, Second Circuit.
July 25, 1933.

SWAN, Circuit Judge, dissenting.

George Z. Medalie, U. S. Atty., of New York City (J. Edward Lumbard, Jr., William B. Herlands, Seymour M. Klein, Russell H. Dorr, and Joseph G. Miller, Asst. U. S. Attys., all of New York City, of counsel), for the United States.

Slade & Slade, of New York City, for appellant Pleva.

Sanford H. Cohen, of New York City, for appellant Schwartz.

Before MANTON, SWAN, and CHASE, Circuit Judges.

CHASE, Circuit Judge.

The appellants were two of four inspectors appointed by the board of elections for

the Sixth election district of the Fourth assembly district within the Southern district of New York to act as such at the polling place of the above election district at the general election held November 8, 1932, to elect presidential electors, a United States Senator, and Representatives in Congress, as well as state and city officers. They had both acted as inspectors before: Pleva for ten years and Schwartz for seven. A voting machine was used, and a part of their duties, as to which they were given special instruction, was to take the figures from the back of the machine where the number of votes cast for each candidate appeared and enter them upon tally sheets. The number of votes so entered upon the sheets became the official count, and that number was credited to each candidate as the vote received by him in that election district.

Pleva was a Democratic inspector and was chairman of the board of inspectors. Schwartz was a Republican inspector. When the polls were closed; they locked the front of the machine; went to the back of it, unlocked the apron to expose the count as recorded on the machine; and read off the numbers. The machine had been moved to within six or eight feet of a table where two other inspectors sat with an assistant to enter upon the tally sheets the vote as called off. The rear of the voting machine could not be seen from the table, and the light in the room was not good enough to permit reading off the numbers. To do this, two flash-lights were used at first and then only one. Pleva called off the numbers while Schwartz observed what he was doing. At times a request to repeat the vote was made from the table where it was being tallied, and Schwartz repeated it. In three instances the votes called off totaled more than the whole number of votes which could have been cast for the office, and, when this fact was discovered, as it was during the tally, an adjustment was made. None of the eighty-nine totals as they appeared on the voting machine were called off and entered on the tally sheets correctly. Those for eighteen Democratic candidates were all raised; those for sixteen Republican candidates were raised, and for two decreased. The vote cast for every other candidate was decreased. The official tally sheets, incorrectly showing the results as above indicated, were signed by each inspector, and were filed in the county clerk's office the following day by Pleva.

■ The defense sought to explain the errors in the tabulation of the vote as being mistakes due to poor light and confusion in the room. Notwithstanding that, the evidence was ample to justify the jury in believing that the false record was made in furtherance of the conspiracy charged in the indictment. The indictment was attacked by demurrers by both appellants on the broad ground that no federal crime was charged. The gist of the allegations was that the appellants conspired to record falsely the votes cast for federal officers and so to injure and oppress unnamed and unknown legal voters in this election district by not correctly counting and reporting their votes as cast.

In the argument now made in support of the demurrers, the ground covered in United States v. Mosley, 238 U. S. 385, 35 S. Ct. 904, 59 L. Ed. 1355, is turned over anew. The distinction there recognized between the rights of candidates and the rights of voters is presented as a reason for holding that Criminal Code § 19 (18 USCA § 51), is not applicable to the facts alleged since, by repealing the other sections of the comprehensive election laws passed originally in 1870, Congress left such things as are here shown to be dealt with exclusively under the laws of the state in which the election is held. In view of the decision in the Mosley Case, supra, it seems unnecessary to do more than point out that this indictment charges the conspiracy as one to injure and oppress voters, not candidates for office, and that it is self-evident that a legal voter is injured unless he is not only permitted to vote, but to have his vote counted as cast. The attempt to distinguish the Mosley Case on the facts in that there paper ballots were cast and all uncounted while here a voting machine was used and the vote incorrectly recorded is wholly unreal. The methods used to falsify the returns differed as the means provided for voting made necessary, but the offense in each instance was the same. In United States v. Gradwell, 243 U. S. 476, 37 S. Ct. 407, 61 L. Ed. 857, the acts charged as federal offenses were at primary elections; and the allegations were that candidates, not voters, had been injured and oppressed. Moreover, three of the indictments were for alleged violations of section 37 of the Criminal Code (18 USCA § 88). In United States v. Bathgate, 246 U. S. 229, 38 S. Ct. 269, 62 L. Ed. 676, not only was one of the counts based on section 37, Cr. Code, but the conspiracy was to bribe voters rather than to deprive voters of the personal right to vote and have their votes counted and returned as cast. This latter offense was expressly reaffirmed to be covered by section 19, Cr. Code (18 USCA § 51), under which these appellants were indicted. Chavez v. United States (C. C. A.) 261 F. 174 was similar to the Bath-

gate Case, in that no violation of the personal right of a voter to vote was charged.

The further ground of demurrer that the voters who were injured were not specifically named is untenable. While the allegation that legally qualified voters who voted in this election district were injured and oppressed by not having their votes counted and returned as cast charged an invasion of the personal right of voters, and so was covered by the section Congress saw fit to retain, the violation of this section is a public wrong. In proving the offense, it is therefore of no moment to allege which voters, among those who voted, were deprived of the right to have their votes counted and returned as cast. One of the objects to be attained in our method of voting is to make it impossible for anyone but the voter to know how he voted. And, when a voting machine is used by numerous voters who vote for numerous candidates and some votes are tallied for every candidate, it is, of course, impossible to know whether the vote of any particular voter has been correctly tallied or not, unless all the votes cast are correctly tallied. Nor can an accused be embarrassed in his defense by the fact that no individual voter is identified by name in the indictment. Even if known, the failure to allege the name of an injured voter would not make the indictment demurrable, though the government in that event might be, on motion, required to disclose whose votes were not correctly tallied. It is obvious that, if the government had to allege and prove the names of the individual voters whose votes were miscounted in erroneously taking the tally from a voting machine, this statute would in every practical way be a nullity as applied to such an election as this. While such a consideration is not decisive, any such nullification of the law is to be avoided unless there are compelling reasons for not doing so, and there are none here.

The plea in bar of Schwartz was based on the fact that he had been called as a witness and had testified before the grand jury which found the indictment. His claim to immunity for that reason is contrary to Kaplan v. United States (C. C. A.) 7 F.(2d) 594, and cannot be sustained. The claim that he was entitled to a continuance when his plea was overruled is merely frivolous.

During the trial, evidence was admitted under exception to show that, while the voting was being done, there was some confusion in the room and some persons voted more than once, and that, while the tally was being taken from the voting machine, a large number of persons gathered around it in such a way that duly authorized watchers could not readily check the tally being made. The relevancy of the conditions prevailing while the vote was being cast is not easy to discern since it apparently could have had no part in the later incorrect tabulation of the result of the voting, but neither can it be perceived that the admission of this evidence, if strictly it were erroneously admitted, was in any respect harmful. The evidence of conditions which prevailed when the tally was made was properly admitted to show how the conspiracy was carried into effect. It is claimed that the evidence of repeater voting was admissible to show the fraudulent intent of the appellants in the conduct of the election and to characterize the erroneous tally as one intentionally so taken in furtherance of the conspiracy alleged. It was not inadmissible simply because it tended to show the commission of a crime under state law. Greater New York Live Poultry Chamber of Commerce v. United States (C. C. A.) 47 F.(2d) 156. The conduct of the appellants and what was done at the polls just previous to and during the taking of the tally was so closely related to the offense charged that it was admissible to show that all was part of a common plan designed, and carried out to injure and oppress voters as alleged. Proof tending to show the appellant's intent was admissible to prove the conspiracy, and this evidence went to show that the errors in the tally were not innocent ones, but were the result of a preconceived plan. Cf. Workin v. United States (C. C. A.) 260 F. 137; State v. Unger, 93 N. J. Law, 50, 107 A. 270; Farmer v. United States (C. C. A.) 223 F. 903, 911; United States v. Shurtleff (C. C. A.) 43 F.(2d) 944, 947; United States v. Sprinkle, 57 F.(2d) 968; Stern v. United States (C. C. A.) 223 F. 762; Heike v. United States, 227 U. S. 131, 33 S. Ct. 226, 57 L. Ed. 450, Ann. Cas. 1914C, 128; Wood v. United States, 16 Pet. 342, 10 L. Ed. 987.

Some exceptions were taken to the supplemental charge of the court and to the refusal to comply with certain requests to charge, but these exceptions are insubstantial.

After the case had been submitted to the jury, the jurors deliberated from 5:30 p. m. until about 11 o'clock, when they retired for the night. The following day found them unable to agree, and at 5:30 p. m. they came into court and so reported. The foreman then gave his opinion that an agreement might be possible. An elderly juror, No. 12, stated in open court: "From my opinion I

532

do not see any conspiracy between those two fellows; that is my opinion— between those two people." He said: "I will not be able to stay long, I am sick. I have trouble with my bladder." The following then occurred:

"The Court: Do you want a doctor?

"Juror No. 12: I did not sleep and I did not eat.

"Juror No. 5: I did not sleep either.

"The Court: Do you want a doctor?

"Juror No. 12: If I got to stay over night I certainly got to have something but, your Honor, I want to know whether I do something wrong or not. I am taking it from you, whatever you say to me.

"The Court: I cannot decide it for you.

"Juror No. 12: I am telling your Honor the honest God's truth. There is no use if I die in the court.

"The Court: You may retire and I will see that you get medical attention."

A motion to discharge the jury was then made by counsel for appellant Schwartz and was denied. By consent of all parties, a doctor employed by the government was called and examined juror No. 12 in the jury room. He reported that he was afflicted with asthma and with bladder trouble, but was in condition to continue to serve on the jury. Cross-examination failed to change his opinion. The court then offered to call any doctor who was presently available to examine the juror "for the purpose of ascertaining his physical condition and fitness to continue in the deliberation of the jury of which he is a part." Another doctor was called, and, after making an examination, reported that the juror "is going to be in for a lot of misery for he states he has had several operations for his bladder and has symptoms of cystitis." The doctor also reported that, although the juror had chronic asthma, that would not bother him very much, "but I think the cystitis will bother him because he is going to leave the court room every hour to go to the bathroom." The doctor had already stated that this caused the juror considerable pain. Upon being informed that the juror did not have to be in the courtroom, this doctor agreed with the other that the juror could continue to deliberate, and stated later, "I have given him enough sedatives to last through the night." He was asked by counsel for appellant Schwartz, "Do you think his deliberations, that his argument with the other eleven men in the room, would have an influence on his physical condition?" and answered, "No, it may keep him awake at night but won't have any influ-

ence on his asthma and cystitis, the symptoms of which he was complaining."

At 9:15 that evening the jury returned into court and the foreman reported that "The jury finds the defendants guilty as charged in the indictment with a recommendation of mercy to the court." Upon request of counsel for appellant Pleva, the jury was thereupon polled, and the verdict was ordered recorded. Immediately, the same attorney asked to have the record show the physical condition of juror No. 12. To this the judge replied, "The juror has been examined by two physicians. Is there anything you wish to say?"

"Juror No. 12: The first doctor said nothing the matter with me.

"The Court: Then the other doctor saw you.

"Juror No. 12: She said she is going to tell something to the court. The other fellow said nothing the matter with me. He just examined me. He said he didn't come to examine me for this thing. He said, 'What got trouble with you?' He said, 'Nothing the matter with you.' I want to stick up tonight. I could not."

The verdict was then entered over objection, leave to make further motions was granted, and the jury discharged. Both appellants moved to set aside the verdict upon the ground that it was not the unanimous verdict of the jury, that it was against the evidence, and that the first doctor had tampered with the jury by suggesting to juror No. 12 that he would be all right when a good verdict was returned. The second ground is clearly untenable, and the third need not be seriously considered. It was based on what was probably an innocuous remark made casually by way of conversation, and gave no indication of the doctor's idea of what would be a good verdict. Indeed, there is no reason to believe that he had any. But we think it well to take this occasion to suggest that, whenever it may become necessary to have a doctor examine a juror, he be cautioned to make no comments in the presence of any juror relating to the case on trial.

The first ground presents a serious question which strikes at the root of the right to a trial by jury. No person may lawfully be convicted by a jury unless every juror actually agrees that upon the evidence and the law of the case that person is guilty. If a verdict of guilty is returned for any other reason, it is a perversion of the constitutional guaranty to a jury trial (Amendment 6).

We may be of the opinion that this juror was mistaken in believing that these appellants had not been proved guilty, but we cannot ignore the fact that, after he had given formal assent to the verdict, and before it was recorded, he made known in open court that he agreed only because he felt unable physically to maintain longer the position he thought was right; that by his assent to the views of his fellows he was securing freedom from another night of confinement which he thought beyond his power to endure. The trial judge did all within reason to provide medical attention for this juror. It is probable that he was unduly beset with fear of the consequences to his health if he tried to support the dictates of his conscience by further resistance, and that the doctors were right in their opinions that his physical condition would not be impaired; but, unless he was so convinced, and clearly he was not, the coercion under which he finally agreed was as potent as it could otherwise have been. In any event, he made it plain that he did not agree to the verdict on the evidence and the law. His agreement, induced by his longing for relief from ills partly real at least, was but the result of coercion even though no coercion was intended. His mind was simply overpowered by his concern for his own well-being and never persuaded on the merits to come into agreement. It was therefore, in law, no verdict at all, and should have been set aside. Compare People v. Faber, 199 N. Y. 256, 92 N. E. 674, 20 Ann. Cas. 879; Rothbauer v. State, 22 Wis. 468; Weeks v. Hart, 24 Hun, 181; Lawrence v. Stearns, 11 Pick. (Mass.) 501; Scott v. Scott, 110 Pa. 387, 2 A. 531.

It should be noticed that we are not dealing with a situation where a verdict has been regularly returned and recorded with nothing at the time to show that it was other than the unanimous agreement of the jurors based on the evidence and the law. We leave untouched the question of what effect may be given to proof offered, after a verdict is recorded, of what transpired during the deliberations of the jury. Affidavits of jurors have here been submitted both in support and in impeachment of the verdict, but we have found it unnecessary to rely upon any portion of them because what occurred in open court compels the result we have reached. For the federal rule as to the competency of jurors as witnesses or affiants in respect to the conduct of a jury on which they served, see Mattox v. United States, 146 U. S. 140, 13 S. Ct. 50, 36 L. Ed. 917; McDonald v. Pless, 238 U. S. 264, 35 S. Ct. 783, 59 L. Ed. 1300; United States v. Clark, 289 U. S. 1, 53 S. Ct. 465, 77 L. Ed. 993.

Reversed.

SWAN, Circuit Judge, dissents with opinion.

SWAN, Circuit Judge (dissenting).

I am unable to agree with that portion of the opinion which holds that the verdict should have been set aside. When the jury was polled, juror No. 12 declared that he agreed to the verdict. The court then directed that the verdict be recorded. Thereupon counsel for appellant Pleva asked to have the record show the physical condition of juror No. 12. And in response to this suggestion the juror made the remark which has been construed as indicating that his agreement was the result of coercion. His remark was not made in answer to an inquiry as to his agreement to the verdict. Such inquiry he had already answered in the affirmative. This he never retracted in his statements to the court. His remark was made in contradiction of the doctor's opinion, as quoted by him, that nothing was the matter with him. What in fact was his condition and whether it was such as to prevent his deliberations in the jury room, the trial court was better able to determine than are we, who see only the printed record. In my opinion, there is not sufficient to upset his ruling, and the judgment of conviction should be affirmed. See People v. Buchanan, 145 N. Y. 1, 29, 39 N. E. 846, In re Buchanan, 158 U. S. 31, 15 S. Ct. 723, 39 L. Ed. 884.